## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| IRON WORKERS LOCAL UNION NO. 405 ANNUITY FUND, Individually and On Behalf of All Others Similarly Situated, <br><br>        Plaintiff, <br><br>    v. <br><br> DOLLAR GENERAL CORPORATION, TODD J. VASOS, and JEFFREY C. OWEN, <br><br>        Defendants. | Case No.    3:17-cv-00063 <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS** <br><br> Judge Jack Zouhary <br><br> CLASS ACTION <br><br> JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

I. NATURE OF THE ACTION AND OVERVIEW ...................................................... 1

II. JURISDICTION AND VENUE ................................................................................ 8

III. PARTIES ............................................................................................................... 8

    A. Lead Plaintiff ............................................................................................... 8

    B. Defendants .................................................................................................... 9

    C. Relevant Non Parties ................................................................................. 10

        1. Confidential Witnesses ................................................................. 10

IV. FACTUAL BACKGROUND ................................................................................ 11

    A. Dollar General's Core Business ................................................................. 11

    B. Dollar General's "Core" Customers .......................................................... 13

    C. Dollar General Closely Tracked Key Drivers of the Company's Performance .... 15

    D. SNAP Benefits Were Important to Dollar General's Core Customers ................. 20

    E. Defendants Marketed to and Tracked in Real-Time Purchases Made by SNAP Participants ......................................................................................... 25

    F. The ARRA and Unemployment Benefits Provided Expanded SNAP Benefits ... 31

    G. The 2013 SNAP Benefit Reduction Adversely Affected Dollar General............. 33

    H. The 2016 SNAP Benefits Expiration Adversely Affected Dollar General........... 35

        1. The 2016 SNAP Benefits Expiration ........................................... 35

        2. Defendants Misleadingly Reassure Investors About the Effect of the 2016 SNAP Benefits Expiration on Dollar General's Core Customers ........................ 37

V. Materially False and Misleading Statements Issued During the Class Period.................. 48

    A. 4Q 2015 and FY 2015 Earnings................................................................. 48

    B. 1Q 2016 Earnings ...................................................................................... 53

VI. Defendants Failed to Comply With Item 303 of Regulation S-K By Failing to Disclose Material Known Trends in the 1Q 2016 Form 10-Q ................................................ 58

VII. LOSS CAUSATION AND EMERGENCE OF THE RELEVANT TRUTH .................. 60

    A. August 25, 2016 Partial Corrective Disclosure..................................................... 62

    B. December 1, 2016 Further Corrective Disclosure ................................................. 65

VIII. SCIENTER ALLEGATIONS................................................................................. 69

    A. The Sheer Amount of Data Analytics Performed by and Available to Defendants on a Real-Time Basis Supports a Strong Inference of Scienter........................ 70

i

B. Defendants Knew or Were Reckless in Not Knowing that the 2016 SNAP Benefits Expiration Would Have an Adverse Impact on the Company Based on Their Experience With the 2013 SNAP Benefits Reduction ....................................................... 75

C. Defendants Knew or Were Deliberately Reckless in Disregarding Information Concerning the Company's Core Operations ................... 77

D. The Company's Bonus Structure Supports a Strong Inference of Scienter ......... 80

IX. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ....................................................................................... 82

X. CONTROLLING PERSON ALLEGATIONS ................................ 83

XI. CLASS ACTION ALLEGATIONS ....................................... 84

XII. LEAD PLAINTIFF AND CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ....................................................................................... 86

XIII. JURY TRIAL DEMANDED ........................................... 94

Court-appointed Lead Plaintiff AMF Pensionsförsäkring AB ("AMF" or "Lead Plaintiff"), by and through its undersigned counsel, files this Amended Class Action Complaint for Violations of the Federal Securities Laws asserting claims individually and on behalf of all individuals or entities that purchased or otherwise acquired the publicly traded common stock of Dollar General between March 10, 2016, and November 30, 2016, inclusive (the "Class Period"), and were damaged thereby, against Dollar General Corporation ("Dollar General" or the "Company"), Todd J. Vasos ("Vasos"), and Jeffrey C. Owen ("Owen") (collectively, "Defendants"). Lead Plaintiff alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge.

Lead Plaintiff's information and belief concerning matters other than itself and its own acts are based upon, among other things, a review and analysis of: reports filed by Dollar General with the U.S. Securities and Exchange Commission ("SEC"); press releases and other public statements issued by Dollar General, Vasos, and Owen; securities analysts' reports about Dollar General; media and news reports related to Dollar General; data and other information concerning Dollar General securities; other publicly available information concerning Defendants; and an investigation conducted by and through Lead Plaintiff's attorneys and their investigators, which included interviews of numerous former employees of Dollar General. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION AND OVERVIEW

1.      This securities fraud class action arises out of Dollar General's failure to be truthful with investors about the foreseeable and immediate falloff in the Company's revenues when its business was devastated by the virtual elimination of its core customer group in 2016.

2.     Dollar General is a retail chain which sells 75% of its products for less than five dollars.  Like most retail chains, Dollar General's investors and analysts focus intently on one key metric: same-store sales growth.  A comparative metric, same-store sales or store "comps" analyzes the amount of quarterly or annual sales growth for stores operating for 13 months or more against the prior period.  At the start of the Class Period, the Company announced its 26th consecutive year and its 32nd consecutive quarter of positive same-store sales growth.

3.     To maintain these preternaturally consistent returns, Defendants purportedly employed a "data driven statistical approach to operations," including a raft of data analytics and reporting functions, which the Company's Executive Vice President of Operations, Owen, described as the "Moneyball" approach, a "scientific way that [Dollar General] execute[s] and make[s] decisions out in the field."  According to Owen, this approach did not "rely on averages or gut feel or just mere opinion or experience," but rather hard historical data.

4.     As a result, and as Owen publicly confirmed at the Company's March 24, 2016 Investor Day, "the results that [Dollar General] achieve[s] are not surprises and they are not new to us.  We know what we're going to achieve before we ever implement."  Thus, when Defendants publicly touted their "confidence" in Dollar General's ability to meet its same-store sales targets given the current macroeconomic environment during the Class Period, investors and analysts believed that this "confidence" was backed by the Company's extensive data analytics and scientific approach rather than the "gut" or "mere opinion" of senior management.

5.     According to the Company, its core customers were "low and fixed income households often underserved by other retailers" who "are the first to be affected by negative or uncertain economic conditions such as unemployment and fluctuating food, energy and medical costs."  Representing 66% of Dollar General's sales, these customers had an annual household

2

income of $40,000, are "living paycheck to paycheck," and "relied upon government assistance." In particular, the Company's core customers relied on the federal government's Supplemental Nutrition Assistance Program ("SNAP"), formally known as "food stamps," to purchase basic necessities.

6.     The timing and amount of benefits received by a SNAP participant had a material impact on Dollar General's financial results. SNAP participants represented nearly a ***third*** of the Company's core customers, and, in some stores, represented 50% to 75% of shoppers in any given period. SNAP participants were known to shop frequently, and approximately 75% of SNAP participants used benefits to purchase SNAP-eligible items, such as food, as well as their own discretionary income to purchase non-eligible items such as cigarettes and alcohol. In fact, at least 15% of SNAP participants' purchases were for non-eligible items. Therefore, when one aggregates both the SNAP-eligible products and non-eligible products, the total impact of SNAP participants purchases on the Company's revenues likely was up to 10% to 12% of total sales for any given period.

7.     In the aftermath of the 2008-2009 financial crisis, Congress enacted the American Recovery and Reinvestment Act of 2009 ("ARRA"), which served as a safety net for American families that were struggling to put food on the table during the economic downturn. The ARRA expanded SNAP in two main respects. First, it provided for an across-the-board increase in the amount of benefits SNAP participants could receive on a monthly basis. Second, it suspended the provision whereby able-bodied adults without dependents only were allowed to participate in SNAP for three months out of every thirty-six month period unless they were employed for 20 hours per week.

8.      The soaring number of SNAP participants and pool of available SNAP benefits spurred by the ARRA made discount retail chains one of the fastest-growing retail sectors in the United States, with dollar stores seeing a 50% increase in sales from 2010 to 2015. And from 2008 to 2013, Dollar General saw its sales growth increase from 2% per quarter to more than 7% per quarter, with total net sales increasing 66% from $10.5 billion in 2008 to $17.5 billion in 2013.

9.      However, as the United States economy began to improve, Congress looked for ways to scale back the impact of the ARRA and the increased budget for SNAP.  On October 31, 2013, the ARRA's across-the-board SNAP benefit increase expired, reducing the amount of SNAP benefits available to participants by $5 billion.  This reduction had the practical effect of significantly reducing the amount of benefits SNAP participants had to spend in Dollar General stores beginning on November 1, 2013, the first day of the Company's fourth fiscal quarter.

10.     The SNAP benefits reduction caused a significant and immediate deceleration in Dollar General's same-store sales beginning in November 2013 and continuing through at least the first fiscal quarter for 2014 due to lower sales of both SNAP-eligible and non-eligible products and less overall foot traffic by SNAP participants to Dollar General stores.  As a result of the 2013 SNAP benefits reduction, Defendants knew that when SNAP participants had less benefits to spend, they purchased less SNAP-eligible and non-eligible products or, in some cases, chose not to shop at Dollar General altogether.

11.     With the United States economy and, more importantly, the unemployment rate, improving, in 2015, 22 states announced that the ARRA's waiver of the three month time limit for receipt of SNAP benefits by unemployed able-bodied adults without dependents would

4

expire on January 1, 2016. Accordingly, as of April 1, 2016, these SNAP participants would no longer be eligible for SNAP benefits unless they were employed or until January 1, 2020.

12. The reinstatement of the time limits for certain unemployed able-bodied adults resulted in the expiration of SNAP benefits for approximately 500,000 to 1 million people and the value of loss for each of these individuals was estimated to be $150 to $170 per person per month. Significantly, while the 2013 SNAP benefits reduction only affected the amount of benefits each participant received, the 2016 SNAP benefits expiration led to many of Dollar General's core customers losing their SNAP benefits altogether.

13. On the first day of the Class Period, March 10, 2016, Defendants told the market that Dollar General would maintain same-store sales growth of 2% to 4% for the foreseeable future and, with respect to fiscal year 2016, generate 3% of same-store sales growth. Despite the looming 2016 SNAP benefits expiration, Defendants reassured analysts and investors of the Company's ability to generate 3% same-store sales growth for fiscal year 2016, citing "merchandising initiatives" that were in place to "drive sustainable growth" and confirming that in the event Dollar General lost the ability to accept SNAP benefits, such a loss would only effect 5% of the Company's total sales.

14. Thereafter on May 26, 2016—nearly two full months after the 2016 SNAP benefits expiration had taken effect—in response to specific questions from analysts about the current effect of the macroeconomic climate on the Company's core customers and same-store sales, Defendants again reassured the market that they had "initiatives in place . . . to ensure that we can keep" same-stores sales "moving" and "to make sure [the Company] deliver[s]" the same-store sales growth targets for fiscal year 2016. Defendants also told analysts and investors that the trends affecting its core customer had not changed since the fourth fiscal quarter of 2015

or, in other words, that the core customer was effectively in the same position in May 2016 as they had been in January 2016.

15.    In reality, however, and as confirmed by five former Dollar General employees, Dollar General had not implemented any "initiatives" or done anything to prepare for the effects of the 2016 SNAP benefits expiration on same-store sales growth despite knowing how the earlier 2013 SNAP benefits reduction had affected the Company's core customers and, ultimately, its financial results.  Indeed, at the time that Dollar General's cover-up of its downward spiraling sales was revealed, Vasos conceded that the 2013 SNAP benefits reduction affected the Company's same-store sales in *"almost exactly the same way"* as the 2016 SNAP benefits expiration, including with respect to overall foot traffic.

16.    Moreover, unbeknownst to investors, the 2016 SNAP benefits expiration had a significant, negative effect on both the behavior of its core customer group as well as same-store sales growth at Dollar General stores almost immediately after April 1, 2016.  Two former Dollar General employees confirmed that there was a reduction in same-store sales growth in April and May 2016 due to the 2016 SNAP benefits expiration.  Several former employees also confirmed that there was less overall foot traffic immediately after the 2016 SNAP benefits expiration went into effect, meaning that less of the Company's core customers were shopping at Dollar General stores.  In fact, despite telling investors that nothing had changed the Company's ability to generate 3% in same-stores sales growth for the fiscal year on May 26, 2016, Defendant Vasos later conceded that the Company could see the effect of the 2016 SNAP benefits expiration *"immediately in the numbers."*

17.    To further conceal the truth from investors, Dollar General attempted to achieve its same-store sales targets by manipulating its same-store sales metric through the process of

"relocating" stores. As recounted by a former regional manager, Dollar General would open a brand new store across the street from another store that was underperforming on same-store sales. This brand new store was called a "relocation store." The brand-new "relocation store" would be assigned the same store number as the older, underperforming store located across the street, which then allowed the sales of this brand-new store to be included in the Company's same-store sales metric despite the fact that the store had not been opened for 13 months or more. New stores started with 20% to 30% mores sales than stores that were old enough to be included within the Company's same-store sales metric.

18.     On August 25, 2016, the truth regarding the negative effect of the 2016 SNAP benefits expiration on Dollar General's same-store sales which Defendants had concealed for months began to emerge. On that date, the Company announced that due in part to the 2016 SNAP benefits expiration, it only had generated 0.9% growth in same-store sales for the second fiscal quarter of 2016. In addressing the lackluster same-store sales growth, Defendant Vasos stated, "the headwind of SNAP for us really was a big deal and also our core customer continues to be under a lot of pressure." On the news, the price of Dollar General's common stock plummeted 18% on heavy volume.

19.     Thereafter, the Company issued its financial results for the third fiscal quarter of 2016 after the market closed on November 30, 2016, announcing that Dollar General had experienced its first quarterly decrease in same-store sales in 34 consecutive quarters or nearly nine years. During the related conference call with investors, Defendant Vasos conceded that the effect of the 2016 benefits expiration on same-store sales growth for the second fiscal quarter of 2016 was far greater than previously reported and that the 2016 SNAP benefits expiration

affected 56% of the Company's stores. In response to the news, the price of the Company's common stock declined an additional 5% on heavy volume.

20. Together, the stock price declines on August 25 and December 1 led to a loss of $6.2 billion in market capitalization. To date, the Company's same-store sales growth has yet to fully recover from the effects of the 2016 SNAP benefits expiration.

## II. JURISDICTION AND VENUE

21. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

23. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §§ 78aa, and 28 U.S.C. § 1391(b) because the Company has its headquarters in this District, it conducts a substantial amount of business throughout this District, and a substantial part of the events giving rise to these claims took place in this District.

24. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets. Dollar General common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "DG."

## III. PARTIES

### A. Lead Plaintiff

25. Plaintiff AMF Pensionsförsäkring AB ("AMF") manages the AMF family of mutual funds, as well as separate pension, private client, and fixed income portfolios. AMF was

established in 1973 as the asset management branch of the Stockholm-based AMF insurance group.  AMF purchased Dollar General common stock during the Class Period at artificially inflated prices and suffered damages when the truth about the SNAP reductions effect on Dollar General was finally revealed and Dollar General's common stock dropped significantly.

**B.    Defendants**

26.    Defendant Dollar General is a Tennessee corporation headquartered in Goodlettsville, Tennessee. Dollar General is one of the largest discount retailers in the U.S., with over 12,000 stores nationwide. The Company competes with discount stores and many other retailers, including mass merchandise, grocery, drug, convenience, variety and other specialty stores.  Dollar General's fiscal year runs from February 1 to January 31 ("FY"), and its quarters run from February 1 to April 30 ("1Q"), May 1 to July 31 ("2Q"), August 1 to October 31 ("3Q"), and November 1 to January 31 ("4Q").

27.    Defendant Vasos was Dollar General's CEO and a member of its Board of Directors as of June 5, 2015, and served in those capacities throughout the Class Period.  Vasos joined the Company in December 2008 as its Executive Vice President, Division President, and Chief Marketing Officer.  Vasos also previously served as Dollar General's Chief Operating Officer from November 2013 until his elevation to CEO in June 2015.

28.    Defendant Owen was appointed Dollar General's Executive Vice President of Operations on June 15, 2015 after previously spending more than 20 years at the Company before retiring in June 2014.  Defendant Owen previously served as Senior Vice President of Store Operations from August 2011 until his retirement in June 2014.  Owen began his career at Dollar General in 1992 as a Store Manager.

29.    Because of their positions in the Company, Vasos and Owen possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and

9

presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Vasos and Owen were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, Vasos and Owen knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were materially false and misleading. Vasos and Owen are liable for the false or misleading statements pleaded herein because they made, or caused to be made, all of these false or misleading statements.

C.     **Relevant Non Parties**

1.     **Confidential Witnesses**

30.     CW 1 was employed at Dollar General as a District Manager and Regional Director, between 2010 and February 2016, with responsibility for stores in Texas and Indiana, during CW 1's tenure with the Company.

31.     CW 2 was employed at Dollar General as a District Training Store Manager for more than a dozen stores in the Southeast region of the United States from May 2012 until March 2016. As a District Training Store Manager, CW 2 trained store managers in supply chain management, merchandising, hiring and personnel management, and inventory management. CW 2 reported to a district manager and a regional director.

32.     CW 3 was employed at Dollar General as a Division Director from October 2011 to April 2017 for stores in the Southeast region of the United States.

33.     CW 4 was employed at Dollar General as a District Manager responsible for the operations of stores in the Northeastern region of the United States from November 2015 to September 2016.

34.     CW 5 was employed at Dollar General as a Regional Director from December 2015 to November 2016 and was responsible for overseeing the operations of stores in the Southeastern region of the United States, which generated $355 million in sales.

35.     CW 6 was employed at Dollar General as a top-ranked Store Manager in the Southeastern region of the United States from May 2015 to February 2016.

36.     CW 7 was employed at Dollar General's corporate headquarters in several roles from 2007 until August 2016.  From 2009 onwards, CW 7 was a Senior Manager in the Financial Planning and Analysis department.

37.     CW 8 was employed at Dollar General as a District Manager from July 2016 until January 2017, with responsibility for stores in the South Central region of the United States.

IV.     **FACTUAL BACKGROUND**

    A.     **Dollar General's Core Business**

38.     Dollar General sells basic household goods, including consumable and non-consumable items at low or discounted prices.  More than 75% of Dollar General's inventory is sold for less than five dollars. As of March 2017, Dollar General operated over 13,429 "small-box" (average of 7,400 square feet) stores located in 44 states, with the greatest concentration of stores in the southern, southwestern, mid-western, and eastern regions of the United States.

39.     Dollar General focuses its sales and marketing efforts on providing consumers with consumables (i.e., perishable and replaceable everyday necessities, such as food, snacks, and cleaning items) at "Everyday Low Prices." Sale of consumable items represent the Company's "core business" and its largest merchandise category—accounting for over 75% of the Company's net sales for the last three years. By focusing on consumables, Dollar General has created a business model in which the same customer returns to the same store repeatedly to purchase the same essential goods.  Dollar General also offers its customers a variety of non-

11

consumable items in order to increase the amount of money its customers spend at Dollar General when they return to purchase consumable items. These items include seasonal decorations and supplies and home goods.

40. During the Class Period, Dollar General, its investors, and market analysts assessed the relative success of the Company's business model and effectiveness of its merchandising initiatives, among other things, utilizing a key metric: same-store sales or comparable store sales (also known as "comps").

41. The same-store sales metric compared the total dollar amount of sales in a retail company's stores that have been operating for a year or more (e.g., >12 months in operation) over a given period (e.g., annually, quarterly, or monthly) to the sales generated during the same period in the past (e.g., comparing 1Q 2016 to 1Q 2015). This metric allowed investors to isolate what portion of a retail company's current sales revenue is the result of sales growth from existing locations, as opposed to sales growth generated by opening new stores during that period. Analysts following Dollar General, such as the Buckingham Research Group, identified the Company's same-store sales as the "[m]ost important" factor for analyzing its stock price.

42. Prior to the start of the Class Period, Dollar General had consistently met or outperformed both internal and external expectations with respect to its same-store sales growth. In particular, from FY 1989 through 2015, Dollar General reported ***26 consecutive years of positive same-store sales growth***. Similarly, as of 1Q 2016, Dollar General had reported 33 consecutive quarters of positive growth.

43. This consistency was important to Dollar General's investors and has been a significant factor in the Company's ability to increase its stock price. Indeed, between 2009 and 2015, Dollar General's stock price has risen over 200%. Commenting on Dollar General's 26

12

consecutive years of same-store sales growth, Vasos noted during the Company's March 24, 2016 Investor Day Conference:

> I'm not sure who else has put those kind of numbers up, but I bet it we're hard-pressed to find folks, especially in consumable retail, that's put up those type of numbers. And the great thing here is over this 26 years, obviously, there's been good economies and there's been bad economies, right? There's been recessions and great recessions and there've been time of great activity. But you can see, we flourished through all of those times. And I'm really fond of saying that in good times, our customers have a little bit more money to spend, and in tougher times, they needed us more.

44.     However, these assertions turned out to be false. In the "tougher times" brought on by a material reduction in the amount of governmental assistance provided to Dollar General's core customers, these customers *avoided* shopping at Dollar General, and the Company experienced its first decline in quarterly same-store sales growth, ending its 34-quarter streak.

### B.     Dollar General's "Core" Customers

45.     Prior to and during the Class Period, the Company marketed its products to and sought to maintain the business of its so-called "core customer," described by Dollar General in its FY 2015 Form 10-K as "low and fixed income households often underserved by other retailers" who "are often the first to be affected by negative or uncertain economic conditions such as unemployment and fluctuating food, energy and medical costs, and the last to feel the effects of improving economic conditions."

46.     According to the Company's then-Executive Vice President and Chief Merchandising Officer, James W. Thorpe ("Thorpe"), "one of Dollar General's core strengths is [its] deep and actionable understanding of [its] customers. We know who they are, where they shop, how they shop, what they buy, how much they spend but more importantly we know their attitudes and their behaviors. And we get this through our integrated and actionable customer

13

segmentation process." Dollar General's "deep and actionable understanding of [its] customers" drove all of the Company's "merchandising and pricing decisions . . . including how [it] market[s] and brand[s] to [its] customers" and how it "operate[s]" its "stores each and every day."

47. To that end, Thorpe explained at the Company's March 24, 2016 Investors Day that in early 2016, Dollar General "re-segmented" its customers to provide "a much more accurate representation of [its] customer spending and [to] significantly improve[] . . . customer insights." This re-segmentation process found that Dollar General had three types of so-called "Best Friends Forever" or "BFF" core customers. According to CW 2, these core customers included, among others, lower income females between the ages of 25 and 45 and older women who were on a budget.

48. Based on the Company's customer segmentation process, Dollar General's BFF core customers typically had an annual income of $12,000 to $52,000 per year. According to slides presented to participants in the Company's March 24, 2016 Investors Day, Dollar General's BFF core customer represented 34% of its shoppers, 66% of its sales, had an annual household income of $40,000, was "[l]iving [p]aycheck to [p]aycheck," and "[r]elie[d] [u]pon [g]overnment [a]ssistance." These customers shopped Dollar General "more often," and "ha[d] the highest annualized spending rates," and the Company had access to "the highest share of wallet with them." In other words, Dollar General captured on average a larger percentage of the income and benefits that a BFF core customer had to spend, as compared to its other customers. As a result, Thorpe described these customers as Dollar General's "most productive" in terms of sales and marketing dollars and noted that "they weigh heavily in [its] decision-making."

49.     According to its public SEC filings, Dollar General endeavored "to gain deeper insights into the spending habits for each of [its] core customer segments." To that end, the Company employed data analytics, customer insights, and customer segmentation to improve demand forecasting and to better target promotions to these core customers. Using such customer-specific data, Dollar General was "intensely focused on helping [its core customers] make the most of their spending dollars."

### C.     Dollar General Closely Tracked Key Drivers of the Company's Performance

50.     Prior to and during the Class Period, Defendants prioritized their analysis and understanding of the key "drivers" of the Company's performance.  The Company publicly claimed to have "dashboard" and "exception-based reporting" that allowed its executives to spend time analyzing "the trends that matter most in the business" and "to get straight to the heart of the matter faster."   According to Owen, because of the Company's "performance management," it was "able to identify and adapt and course correct around trends very, very fast."  Owen further stated:

> we know exactly what are the most – the most correlative drivers of performance and those are the things that we spend most of our time on.  And what we're able to do [with] this and the way we approach it is, we don't rely on averages or gut feel or just mere opinion or experience.  We provide and we employ a data-driven statistical approach to operations.  We really have a scientific way that we execute and make decisions out in the field.  And for those of you familiar with the term moneyball, that's kind of the approach we take to our operating environment.

Accordingly, Owen represented to investors that "***the results that [Dollar General] achieve[s] are not surprises and they are not new to us.  We know what we're going to achieve before we ever implement***."

51.     In addition to customer segmentation and analysis, *see supra* Section IV.B, Defendants' performance management capabilities purportedly included what Vasos described during the March 24, 2016 Investor Day as "great category management processes."   These

15

processes, which, according to Thorpe, were the "engine for delivering sustainable sales growth," were designed to accurately assess the contribution of each product at each store to both Dollar General's overall sales growth and, importantly, to the execution of the Company's efforts to attract and retain its core customers.

52.     As described by the Company during the March 24, 2016 Investor Day, these processes involved five steps.  First, Dollar General conducted "a storewide analysis that determine[d] the productivity of [its] assortments."  This analysis "utilize[d] a sales and profitability heat map of the entire store" and determined on a store-by-store basis how the Company could generate sales growth in each store or, as explained by Owen, "how we come more productive in the same size box and even a smaller box."

53.     Once the storewide analysis was complete, Dollar General conducted "a strategy review" consisting of "an external and internal assessment of [the Company's product] assortment," utilizing insights from "the customer segmentation" process.  This review allowed the Company to ensure that the assortment of products sold at its stores were targeting Dollar General's core customers, including BFF core customers who were on a fixed income and dependent on government assistance.

54.     After the "strategy review," Dollar General conducted a "business review" to determine if the product assortment identified through the "strategy review" actually "achieve[d] the strategies" identified through the Company's customer segmentation process.  Conducted on a product-by-product and store-by-store basis, the "business review" was meant to determine how well the particular product assortment would achieve the Company's strategy of generating sustainable growth through sales generated by its core customers.

55.     During the business review, "every single item in the [product] assortment [wa]s forecasted at a unit per store per week level and include[d] all details and all related costs and expense structures" so that, according to Owen, the Company could "assess the true contribution of each and every item" in relation to its financial results.  The business review generated an "assortment pro forma" report, which Owen confirmed that he, among others, "continually monitor[ed]" and against which senior management measured Dollar General's performance, holding Owen, among others, "accountable for each any every item's contribution" to the Company's financial results.

56.     To that end, according to CW 2, Dollar General could, for example, calculate the average dollar amount spent in a Dollar General store by a customer who purchased a gallon of milk.  In fact, CW 2 recalled that regional directors would visit stores and quote what customers would spend if they bought the staples, which were typically SNAP-eligible products.

57.     Following the business review, "the final recommended assortment and financial performer [wa]s reviewed and approved by senior level management," including Dollar General's "store operations team," after which it was sent to the specific store, typically by the stores operations team, via a "plan-o-gram." A plan-o-gram is a diagram that shows how and where products should be placed or displayed within the store in order to increase customer purchases.

58.     The final step in Dollar General's category management processes was "a postmortem" which occurs approximately "three months after the plan-o-gram is actually set in the store."  The postmortem included "all [the] stakeholders involved" in the process, such as "store operations, supply chain, [and] merchandising" and, for every item, it looks at "performance versus its forecast."   Any issues identified through the postmortem were then

17

"addressed," including "mid-course corrections." If, for example, a product was too expensive for Dollar General's core customer, or that product was not selling at a particular location, these category management processes purportedly allowed the Company to identify the issue (e.g., the price of product or the location of the store) and resolve it.

59.     After explaining the five steps of Dollar General's category management processes at the March 24, 2016 Investor's Day, Owen reported that these processes "improve[d] every year as [the Company] incorporate[d] new data analytics and customer insights."

60.     In addition to category management processes, the Company publicly represented that inventory was "something that [Dollar General] squarely focused on" because "being in-stock is one of the key drivers . . . of our comp store sales." According to Owen, "[w]hat we know is stores with the lowest out-of-stocks, their comp sales are 3X higher than the stores with higher out-of-stocks." Thus, Dollar General employed what Owen described as "an accurate perpetual inventory . . . replenishment system." Launched in August or September 2015, the goal of this system was, according to Owen, "to improve [Dollar General's] in-stock position" and its "on-shelf availability . . . to make sure that" the Company has "the product that [its] customer wants when she comes in a store and has it for her at the right price."

61.     CW 2 reported that Dollar General store managers would plan their inventory stocking based on trends in sales volumes and items being purchased by customers. CW 2 confirmed that the consensus at Dollar General was that a store must never run out of staples (e.g., SNAP-eligible products like milk and frozen pizzas) because once a customer comes in for a staple, they will usually purchase other items, including non-eligible products at a greater cost. If, however, the store does not have SNAP-eligible products in stock, the SNAP customer will go

elsewhere. In other words, according to CW 2, Dollar General knew that if a store ran out of staples, the customer may not spend anything at the store or shop at Dollar General in the future.

62. Dollar General also sought to ensure that its district managers were able to properly leverage the Company's proprietary point of sale ("POS") systems (e.g., cash registers designed to retain and track key pieces of information) and the aforementioned business intelligence regarding category and inventory management in the field through its key performance indicator application or "KPI app." The KPI app offered a color-based heat map identifying sales opportunities the district manager should prioritize. As explained by Owen, the KPI app provided the Company's district managers with a view of the "health of their district" and "the key areas they need[ed] to focus on," while also providing its senior management the ability to "channel" the district managers' "energy" to where "the data tells" Dollar General senior management it will "get the greatest return for their time spent."

63. According to Owen, once a district manager arrived at a store, the KPI app would identify and prioritize for the district manager all of the opportunities for improving the stores' operations. Based on the KPI app's color-coded system, district managers thus were aware immediately of the top one or two things (highlighted red) that they could do in a particular store that day to improve sales growth. For example, the KPI app might identify that the biggest opportunity for a particular store to increase same-store sales is through sales in the pet and perishable departments.

64. Because it was "completely aligned with their bonus potential," Owen confirmed that the KPI app allowed the district managers "to focus where they're going to get the greatest return for their effort" and gave "them the opportunity to get a bigger payout at the end of the year."

65.     As a result of Dollar General's purportedly robust system of analyzing store and product data virtually in real time, Defendants had access to critical sales information at all times.

**D.     SNAP Benefits Were Important to Dollar General's Core Customers**

66.     Prior to and during the Class Period, Dollar General benefited from and was reliant on the U.S. Government's Supplemental Nutritional Assistance Program ("SNAP") to generate sales among its BFF core customers.

67.     Also known as "food stamps," SNAP is a federal program that provides monthly assistance to low income individuals to purchase food. SNAP is the largest nutrition assistance program administered by the U.S. Department of Agriculture ("USDA"), with 100% of SNAP benefits covered by the federal government. Historically, the maximum amount of SNAP benefits a participant can receive each month is based upon the Thrifty Food Plan ("TFP")—the national standard establishing the minimum cost to feed a family of four under current nutritional standards and guidance. The actual amount of SNAP benefits issued to each household may vary, however, depending upon the household size and income level.

68.     Unlike many other government assistance programs, SNAP eligibility does not depend on family structure, age, or disability status and, therefore, reaches a broad range of disadvantaged households. In fact, SNAP provided aid to approximately 26 million individuals in 2008, which steadily increased to approximately 47 million individuals by 2013.

69.     While SNAP benefits are liberally granted to individuals who meet basic eligibility requirements, SNAP places conditions on participants who are considered "Able-Bodied Adults Without Dependents" (or "ABAWD"). In particular, ABAWDs only are eligible to receive three months of SNAP benefits within a 36-month period unless they meet certain employment-related conditions, such as maintaining 20 hours per week of employment or

participating in an approved employment training program ("ABAWD Time Limit"). At least one of Dollar General's archetype "core" customers—e.g., a single, older woman on a fixed income—would have been considered an ABAWD under the regulations.

70. In the wake of the 2008-2009 financial crisis, Dollar General decided to augment its revenue by selling SNAP-eligible products to SNAP participants, investing in upgraded POS systems that would accept SNAP benefit cards, and adding food items to its stores' product assortments to qualify under SNAP as an authorized retailer.

71. In order to be eligible to accept SNAP benefits at its stores, according to the USDA, Dollar General was required to "sell food for home preparation and consumption" and either "[o]ffer for sale, on a continuous basis, at least three varieties of qualifying foods in the . . . four staple food groups [meat, poultry, or fish, bread or cereal, vegetable or fruits, and dairy products], with perishable foods in at least two of" these groups, or "[m]ore than one-half (50%) of the total dollar amount of all retail sales . . . sold in the store must be from the sale of eligible SNAP foods." Before and throughout the Class Period, Dollar General was authorized to accept SNAP benefits.

72. As of September 2013, more than 40% of dollar-store customers received some type of government assistance. Sales at dollar stores, such as Dollar General, therefore were correlated to the number of households participating in SNAP. Any meaningful changes in who could participate in SNAP or the amount of benefits any one SNAP beneficiary could receive would likely have a negative impact on the financial results of dollar stores like Dollar General.

73. The amount of benefits a SNAP participant received was important to SNAP-authorized dollar stores such as Dollar General because SNAP participants tended to shop frequently and spend additional, discretionary income on products that are not eligible to be

purchased with SNAP benefits. In 2012, for example, SNAP participants made an average of ten SNAP purchases per month each with an average sale amount of $30. Moreover, approximately 75% of SNAP participants used some of their own money to make purchases in addition to SNAP benefits. As a result, while purchases, with SNAP benefits purportedly constitute 5% to 6% of Dollar General's total revenue, when one accounts for SNAP participants' purchases with money from their own pockets, the total impact of SNAP participants' purchases on revenues could be up to 2.0 times more, thus accounting for 10% to 12% of total revenues.

74. The amount of SNAP benefits received by a SNAP participant usually dictated: (i) whether the SNAP participant frequented dollar stores; (ii) the amount of SNAP-eligible goods purchased by the SNAP participant at the dollar store; and (iii) whether, in addition to utilizing SNAP benefits, the SNAP participant spent his or her own discretionary income and if so, how much. For example, if a SNAP participant received fewer benefits, he or she may only be able to do one shopping trip and, in that instance, typically would go to a store that has a wider selection than a dollar store. To that end, CW 3 confirmed that Dollar General was considered a "secondary trip store;" if SNAP participants received a smaller benefit, they would go to, for example, Walmart for one big trip and skip-over Dollar General altogether because they did not have the financial ability to make a second trip.

75. And, in addition to generating fewer sales of SNAP-eligible goods, a smaller benefit meant that the SNAP participant was less likely to spend his or her discretionary income on non-SNAP-eligible products, including non-eligible health and beauty products and non-consumable items, during the same trip. CW 2 confirmed that a transaction with a typical SNAP recipient at Dollar General included both SNAP-eligible products and non-eligible products. For example, a SNAP recipient may purchase ten items, eight items of which are SNAP-eligible

products and two items of which are non-eligible products. Based on CW 2's experience, on average, a typical SNAP transaction was comprised of approximately 85% SNAP-eligible products and 15% non-SNAP-eligible products. Accordingly, if Dollar General was no longer able to accept SNAP benefits or if fewer of its core customers received SNAP benefits, the Company stood to lose revenue from both the SNAP-eligible product sale and the non-eligible product sale.

76. The timing of the SNAP participant's receipt of benefits also was important to Dollar General. During the Class Period, SNAP participants tended to spend their benefits as soon as they received them. For example, CW 1 recalled that SNAP recipients who received their benefits at the beginning of the month typically would splurge and spend all of their benefits at once, requiring Dollar General to fully stock its stores at the beginning of each month.

77. If those benefits were provided to the SNAP participants once a month at the beginning of the month, then stores needed to ensure that they managed their inventory accordingly, stocking up on SNAP-eligible products and non-eligible products typically purchased by SNAP participants on or before the first of the month. If, however, those benefits were paid out in two installments, for example, on the first of the month and the fifteenth of the month, authorized-SNAP retailers altered their inventory schedules to ensure that they had in stock the products typically purchased by SNAP participants at both the beginning and the middle of the month.

78. Additionally, the location of Dollar General's stores was important for assessing the significance of SNAP benefits to the Company's sales. For example, stores located in urban areas were more likely to be dependent on the sale of SNAP-eligible products and any additional discretionary purchases made by SNAP recipients in that store. Additionally, stores located in

the areas of the country with higher unemployment rates were more likely to rely on sales of SNAP-eligible products and non-eligible products by SNAP recipients to meet sales targets set by the Company.

79.    CW 4 confirmed that the availability of SNAP funds to Dollar General customers for stores set up in urban communities significantly impacted when customers shopped and what they purchased.  In fact, CW 4 reported that some stores had 50% of their sales generated by the purchase of SNAP-eligible products with SNAP benefits, and the stores CW 4 managed had at least 10% and as much as 20% of their sales generated by the use of SNAP benefits.  Similarly, CW 2 estimated that SNAP sales accounted for anywhere from 0% to 90% of total sales in stores he worked with, with some stores in Georgia relying on the use of SNAP benefits for 50% of their total sales.  CW 5 confirmed that for some stores located in South Carolina, SNAP participants represented 80% to 90% of the stores' customer base.

80.    CW 1 likewise stated that stores in rural locations had a lower SNAP customer base than stores in more urban areas.  CW 1 illustrated this phenomenon by explaining that while 50% to 60% of customers frequenting Texas Dollar General locations utilized SNAP benefits, a lower percentage of customers frequenting Indiana Dollar General locations used SNAP in these stores.

81.    Because of the importance of SNAP to Dollar General's sales, CW 2 confirmed that the Company provided training on SNAP to all its store managers through its Learning Management System, accessible through its intranet.  This training explained the applicable SNAP statutes, what types of goods were covered by SNAP (mainly food products), how to package SNAP items, and the dynamics of a typical SNAP transaction, including transactions that included both SNAP-eligible and non-eligible products.  With respect to these transactions,

CW 2 confirmed that Dollar General's POS automatically separated SNAP and non-SNAP purchases, even if the items were purchased by the same customer. According to CW 2, a typical transaction by a SNAP participant would consist of 85% SNAP-eligible products and 15% non-eligible products.

82.     CW 2 reported that Dollar General store managers were trained to plan for and analyze sales volume increases, which were typically attributable to events such as holidays and dates SNAP cards were reloaded, among other events. Store managers also were trained to review a store's inventory activity through analyzing graphs and charts generated by "Storenet" (beginning in December 2015), the Company's internal system, which utilized the data from the Company's POS (or cash registers). As explained by CW 2, these charts and graphs illustrated when certain products were selling and allowed a store manager to determine what events, such as a holiday or a SNAP card reload, may have occurred at the same time to prompt any spikes in sales overall or for a particular product.

83.     CW 6 confirmed that CW 6 received training with respect to SNAP early on in CW 6's tenure as a store manager. During CW 5's training, CW 5 learned about the existence of the "SNAP/EBT financial summary," which showed the "total SNAP sales."

**E.     Defendants Marketed to and Tracked in Real-Time Purchases Made by SNAP Participants**

84.     Given that the Company's BFF core customers relied upon SNAP benefits, Dollar General advertised its status as a SNAP-authorized retailer in its stores. CW 2 confirmed that Dollar General mandated that a poster advertising the fact that the store accepts SNAP be posted at the front of each individual store, as well as SNAP signs in every food section and in every four feet of shelving. CW 4 recalled that there was a "pretty big push" to make sure that SNAP posters were prominently displayed in Dollar General storefronts and that these posters would

have been required to be displayed as part of the Company's "Floor Set" or "plan-o-gram," which was distributed by Dollar General's corporate offices to each store on a monthly basis.

85.     Dollar General also planned promotions around products that typically were purchased by SNAP participants.  According to CW 7, Dollar General had a Design & Development Center near headquarters.  The Center was a giant warehouse designed to resemble a Dollar General store in which the Company tried out different displays and often photographed the displays to send them to the store to ensure the proper placement of inventory.

86.     CW 6 stated that CW 6 received quarterly emails from Dollar General's Accounting and Marketing departments detailing the percentage of SNAP sales, and the amount and a list of non-SNAP-eligible items purchased by a SNAP participant. These emails also directed regional directors, district managers, and all the stores in the district to promote products typically purchased by SNAP participants by, for example, creating "endcaps"—stations at the end of aisles in the stores—near the store's entrance.  According to CW 6, both CW 6's regional director and district manager visited CW 6's store to check that the endcap displays to promote non-eligible products to SNAP recipients were installed on schedule.

87.     CW 2 confirmed that store managers received monthly emails from the Merchandising Department instructing the managers on what items to put on sale and what displays needed to be placed near the front door.  Generally speaking, SNAP-eligible products (e.g., food) were the focus of the displays utilized in Dollar General stores and, according to CW 2, stores were required to re-stock food before re-stocking non-SNAP items such as clothing or auto supplies.  CW 2 recalled that district managers appeared at individual stores once every three to five weeks, while regional directors visited individual stores every two to three months.

CW 2 confirmed that other executives, including Vice Presidents, also frequented stores and gave advice on displays and stocking inventory.

88.    Additionally, Dollar General captured and tracked information concerning transactions by SNAP participants.  CW 2, CW 6, and CW 7 recalled that Dollar General captured information about purchases by SNAP participants through the Company's POS system.  CW 6 confirmed that by June or July 2015, the Company's POS system, which captured data on total SNAP sales among other things, was linked to Storenet, to which the Company's accounting and marketing departments had access.  CW 7 described Storenet as a large "umbrella" portal containing payroll data, receiving data, and other information for a store's use.

89.    According to CW 2, the POS could then generate "Tender Reports" and "Sales Reports."  In addition to being available on StoreNet, CW 2 confirmed that Tender Reports and Sales Reports were available on the district managers' "dashboard," and were printed daily by each store and maintained on the premises of each store for approximately two years.

90.    As explained by CW 2, Tender Reports showed sales broken down by tender type (also called "Tender Type Reports") such as cash, credit card, debit card, or EBT (SNAP). Tender Reports showed the total amount of sales plus the average SNAP transactions in any given day.

91.    CW 2 stated that a Tender Report could include the following metrics:  (i) total number of SNAP items sold; (ii) total dollar amount of SNAP sales; (iii) total number of non-SNAP items sold; (iv) total dollar amount of non-SNAP sales; (v) average number of items per transaction (SNAP & non-SNAP); and (vi) average dollars spent per transaction (SNAP & non-SNAP).  CW 7 also confirmed that these Tender Type Reports allowed Dollar General to categorize transactions by store, merchandise type, geographic location, payment type (e.g.,

SNAP benefit, cash, or credit card), among other details captured about the transaction by the POS.

92.     According to CW 8, these reports were printed daily by the key holder for each register in each store (i.e., the POS) and included the raw data from the transactions on that date. CW 8 also confirmed that Dollar General's POS was connected to StoreNet, which was accessible to everyone from store managers and above.  StoreNet was accessible from the store manager's computer and maintained, among other things, the store's sales reports.  CW 6 also confirmed that store managers were required to print charts with the data from the POS, which included sales metrics, categorical breakdowns, and tender type breakdowns for cashiers' use.

93.     In addition to Tender Type Reports, Dollar General's POS generated daily Sales Reports.  CW 2 confirmed that the Sales Reports included the information contained in the Tender Reports as well as refunds, voided sales, and other data.  CW 2 further confirmed that reports showed the method of payment used by Dollar General's customers, including whether the customer had used any SNAP benefits to pay for a portion of their purchases.  Given that a typical SNAP participant purchased both SNAP-eligible and non-eligible products during the same transaction, according to CW 2, these reports tabulated not only the sales dollar amounts generated by the use of SNAP benefits, but also the dollar amounts of non-eligible goods purchased by the SNAP participant using his or her own discretionary income.

94.     CW 8 stated that district managers typically reviewed the sales data found in StoreNet and could create customizable reports.   District managers were responsible for synthesizing the sales data and then sharing it with regional managers.  In turn, the regional managers would review and distill the information before providing the data to the Division Vice

President. According to CW 8, employees at the district manager level and higher would review the reports to determine why sales were higher or lower for a given period.

95. CW 7 recalled that Dollar General tracked SNAP sales as a percentage of total sales and the average dollar purchase of SNAP recipients. This information was readily available in the Company's "Audit Works" system. According to CW 7, data from the stores' POS systems, including every detail of every transaction that was generated through the POS, was pulled nightly into "T logs." The T logs were then automatically fed into the Audit Works system. Audit Works was accessible at the corporate level and, as CW 7 confirmed, could calculate details such as the amount of milk sold on a given day.

96. CW 7 stated that the "Cash Control" or the "Cash Audit" group monitored the nightly T log pulls to obtain sales reconciliation data for each Dollar General store. CW 7 further stated that the Company's Treasury department also used the data to forecast Dollar General's expenses and fees. CW 7 confirmed that Audit Works would have the individual SNAP and non-SNAP purchase data used in generating Tender Reports and that such data made it possible to break down purchases attributable to SNAP recipients into: (i) the total and average number of SNAP items purchased; (ii) the total and average SNAP dollars spent; (iii) the total and average number of non-SNAP items purchased; and (iv) the total and average non-SNAP dollars spent, per transaction.

97. CW 7 reported that the Merchandising and Marketing departments, among others, would review the data in the Audit Works system to analyze trends in sales and the purchasing habits of customers. For instance, according to CW 7, an individual who used Audit Works could determine whether customers who purchased a pack of cigarettes also purchased a can of soda. CW 7 recalled that the results of these analyses were used by Dollar General's corporate

Merchandising and Marketing professionals to direct the Company's store managers as to what items needed to be kept in stock, as well as what displays were to be used, when the displays should be used, and where the displays were placed in the store. CW 7 confirmed that very few decisions regarding the store displays were made by the individual stores.

98. According to CW 7, each Dollar General store generated a weekly Store Summary report every Wednesday through Storenet (which was linked to the POS system). This weekly Store Summary provided a similar SNAP and non-SNAP breakdown as the Audit Works system, *see supra* ¶¶ 95-96. CW 7 stated that the day the weekly Store Summary report was released was considered to be a "big reporting day."

99. CW 7 also confirmed that between at least 2015 and August 2016, there were Weekly Sales Meetings every Wednesday or Thursday in the "Think Tank," a conference room located between the CEO and the COO's offices. These meetings were led by Larry Bricker, Director of Finance-Merchandising, and included significant contributions from Dana Lee, Vice President of Merchandise Planning and Allocation. During the meetings, as reported by CW 7, Bricker and Lee would field questions from the CFO and occasionally from the CEO when he attended the meetings. CW 7 stated that when the CEO attended these meetings, he would make occasional comments to the effect of "we need to get sales up before the quarter" ended.

100. CW 7 further stated these meetings included a forecast review, which was a comparison of actual sales with projected monthly and quarterly sales. CW 7 confirmed that sales and data from the previous week along with the adverse or positive factors affecting the sales were discussed at these meetings. CW 7 also recalled that the Operations Department would discuss regional issues affecting the Company's sales during these meetings. If sales were good, then the discussions during the meeting were lighthearted, according to CW 7. However,

if sales were down, the various reasons for the decline would be discussed along with potential remedies such as promotions, advertisements, coupons, and other "levers."

101.    Additionally, Dollar General utilized a profit and loss or "P&L" statement which allowed the recipient of the statement to filter the data by the "method of payment," which identified the sales that involved SNAP benefits.  According to CW 2, the P&L statement was available two weeks after the end of each month and could be accessed and run through Dollar General's intranet contained within all Dollar General store computers.  CW 8 recalled that CW 8 had access to a P&L report generated once a month, typically one week after the month ended via the Company's intranet or "Dolgen.net."  CW 1 confirmed that SNAP-related figures were broken down monthly in Dollar General's P&L report and that the report typically was available two to three weeks after the end of each month.

102.    Dollar General also used its inventory system to track other SNAP-related information.  Because SNAP cards used by Dollar General's customers may be reloaded at different times, according to CW 2, store managers had to track the dates of SNAP reloads in order to effectively plan their inventory.  For example, CW 2 recalled that Georgia changed the reload timing for its citizens' SNAP benefit cards from once at the beginning of each month, to different times during the month for each recipient depending on the recipient's last name.  Thereafter, SNAP purchases were no longer concentrated at the beginning of the month but, instead, occurred throughout the month, changing the way Dollar General's Georgia stores had to stock their shelves.

**F.    The ARRA and Unemployment Benefits Provided Expanded SNAP Benefits**

103.    Prior to the start of the Class Period, the discount or dollar store industry was one of the fastest-growing retail subsectors in the United States.  Dollar stores saw a 50% increase in sales from 2010 to 2015, compared to a 17% rise in total retail sales during the same period.

31

Dollar General is the biggest player in the industry, sharing 75% of the market with Dollar Tree, and reporting total sales of $22 billion in FY 2016. Dollar stores' increased sales are directly attributable to the aftermath of the 2008-2009 financial crisis and the resulting Great Recession.

104.    In 2009, Congress enacted the ARRA as both an economic stimulus to boost the purchasing power of low income families and a safety net for families that were struggling to put food on the table during the Great Recession. To achieve these goals, among other things, the ARRA temporarily expanded SNAP in two main respects.

105.    The first benefit provided by the ARRA was an unprecedented, across-the-board increase in the amount of SNAP benefits to households. Specifically, the ARRA increased the maximum benefit amount to 13.6% over the current TFP, which amounted to increases of $24, $44, $63, and $80 for one-person, two-person, three-person, and four-person households, respectively, per month. The ARRA also increased the minimum benefit amount from $14 to $16. By providing a generalized fixed-dollar increase without regard to individual considerations, the effective increase of benefits under the ARRA was close to an average of 20%.

106.    The increase in the amount of benefits was set to continue until the TFP exceeded the increased benefit amount set by the ARRA. Stated otherwise, the ARRA's increased benefit amount would remain until inflation in the cost of food rose 13.6%. At the time the ARRA was enacted, the benefit increase was expected to last until 2018.

107.    The second SNAP-related provision of the ARRA was a nationwide suspension or waiver of the ABAWD Time Limit through September 2010. While ABAWDs were still required to comply with employment training requirements, their benefits would not expire at the

end of three months. This relieved employable individuals from the pressure of finding work in a difficult economic climate.

108.    Because of slow economic growth and high unemployment rates, following the expiration of the ARRA's waiver of the ABAWD Time Limit in 2010, states were able to take advantage of longstanding unemployment insurance benefits and the temporary Emergency Unemployment Compensation program to qualify for extended waivers of the ABAWD Time Limit. All states, with the exception of Nebraska, were eligible for and most took advantage of extensions of the waiver.

109.    Dollar General thrived in the face of the Great Recession and nationwide economic turmoil as a result of the ARRA and extended unemployment benefits. In February 2009—the first month that ARRA was effective—Dollar General reported a 15.1% increase in same-store sales.  From 2008 to 2013, the Company saw an increase in its same-store sales from about 2% per quarter to an average of more than 7% per quarter.

**G.    The 2013 SNAP Benefit Reduction Adversely Affected Dollar General**

110.    In August 2010, Congress passed a bill setting March 31, 2014 as the expiration date for the benefit increase instituted by the ARRA in 2009.  In December 2010, Congress accelerated the expiration date for the ARRA benefit increase to October 31, 2013.  Accordingly, under the December 2010 bill, effective November 1, 2013 (the first day of Dollar General's 4Q 2013), the ARRA SNAP benefits increase expired and the amount of SNAP benefits were reduced across-the-board for all participants by an aggregate of $5 billion nationwide (the "2013 SNAP benefits reduction").

111.    The 2013 SNAP benefits reduction had the practical effect of significantly reducing what an individual SNAP participant could spend on SNAP-eligible items on a monthly

basis, from $276 per month for the average household to $255 per month, a $21 per month or 7% reduction in SNAP benefits from the previous year.

112.    Given the correlation between dollar stores financial results and the availability and amount of SNAP benefits, investors and analysts were concerned about the potential negative impact of the 2013 SNAP benefits reduction on the Company.  Then-CEO Richard Dreiling ("Dreiling") attempted to assuage these concerns by explaining that Dollar General likely would not experience the brunt of the 2013 SNAP benefits reduction (e.g., the effect would be "minimal" for Dollar General "as compared to everyone else") and that any negative effects experienced by the Company would be with respect to sales of non-consumables.

113.    In reality, however, the 2013 SNAP benefits reduction caused a significant and immediate deceleration in same-store sales growth beginning in November 2013 and continuing through at least the first quarter of 2014.  Additionally, according to CW 1, because the 2013 SNAP benefits reduction included changes to when and how often such benefits were disbursed to participants, Dollar General had to alter its inventory system, which assumed that SNAP participant customers would splurge and spend their benefits at the beginning of the month, by changing the dates on which it replenished its inventory.  As of November 1, 2013, SNAP participants affected by the new loading dates were dividing their purchases up among a number of trips and were not spending as much at Dollar General (e.g., no longer buying non-essential items or indulging in impulse shopping).

114.    By the end of 4Q 2013, Dollar General could no longer ignore the impact of the 2013 SNAP benefits reduction on the Company.  In March 2014, the Company reported that its same-store sales growth for 4Q 2013 had fallen to 1.3%, due in part to "a pullback in our core customer spending" caused by, among other things, "reduced government assistance."  During a

related conference call, Dreiling confirmed that "many of [Dollar General's] core customers are continuing to struggle, giv[en] the well-publicized headwinds, such as reduced government benefits."

115.    Dreiling later acknowledged that the 2013 SNAP benefits reduction had taken a significant toll on its core customer (and, accordingly, the Company's financial results) and concluded that Dollar General had "underestimated the impact" of the 2013 SNAP benefits reduction on its core consumers.  This toll included lower sales of SNAP-eligible products and non-eligible products to SNAP participants, as well as less overall foot traffic by SNAP participants to Dollar General stores. The Company was only able to build momentum in its same-store sales in 4Q 2014 as it "lapped the SNAP benefit cuts in the fourth quarter of 2013," allowing it "to achieve a comp sales growth of approximately 5% for the fourth quarter."

116.    Given the impact of the 2013 SNAP benefits reduction on Dollar General, and specifically its effect on the purchases of SNAP participants, Defendants now knew how a reduction in SNAP benefits could materially affect its core customers and, in turn, on the Company's inventory levels and same-store sales growth.

### H.    The 2016 SNAP Benefits Expiration Adversely Affected Dollar General

#### 1.    The 2016 SNAP Benefits Expiration

117.    By 2015, the economy and, specifically, the unemployment rate, had substantially recovered. As a result of the improved economic conditions, 22 states announced in 2015 that the waiver of the ABAWD Time Limit would expire in those states on January 1, 2016 (the "2016 SNAP benefits expiration").  ABAWDs, who had been receiving some form of SNAP benefits almost continuously since the passage of the 2009 ARRA, would now only be allowed to receive SNAP benefits for three months out of every 36 months, unless they worked 20 hours per week or were enrolled in an approved employment training program.  Accordingly, on and after April

1, 2016, ABAWDs who were not working or receiving employment training would not be eligible to receive SNAP benefits again until January 1, 2020 in these 22 states.

118.    The reinstatement of the ABAWD Time Limit as of January 1, 2016 resulted in the expiration of SNAP benefits for approximately 500,000 to 1 million people. The value of the loss for each of those individuals was estimated to be $150 to $170 per person, per month.

119.    The 2016 SNAP benefits expiration represented a seismic shift in the availability of government assistance to certain of Dollar General's core consumers—in particular, the older, female customer on a fixed income—who the Company counted on to buy both consumable and non-consumable items in its stores.   Instead of just *reducing* benefits to all recipients, as had happened with the 2013 SNAP benefit reduction, many of Dollar General's core customers would now no longer have access to any SNAP benefits with which to purchase basic necessities.

120.    The 22 states that reinstated the ABAWD Time Limit included Alabama, Alaska, Arizona, Arkansas, Connecticut, Florida, Georgia, Idaho, Kentucky, Maryland, Massachusetts, Mississippi, Missouri, New Jersey, New York, North Carolina, Oregon, Pennsylvania, South Carolina, Tennessee, Washington, and West Virginia.   Of the 22 states that reinstated the ABAWD Time Limit, 19 were required to do so because their economies had sufficiently recovered such that they no longer qualified for a waiver. The other three states—Mississippi, South Carolina, and West Virginia—still qualified for a waiver but chose instead to reinstate the ABAWD Time Limit.

121.    In 2016, these 22 states were densely populated and represented approximately 65% of the total U.S. population.  These states also included some of the largest urban centers in 2016.  In particular, New York City was the largest city in the U.S. by population, which had 4.5

million more people than the next largest city in 2016. Overall, these 22 states include 18 of the largest 50 U.S. cities by population in 2016. At least 56% of Dollar General's stores were located in these 22 states, with many of these locations being in more urban locations, and therefore more reliant on SNAP benefits and SNAP participants to generate sales.

122. While the 2013 SNAP benefits reduction only affected one aspect of SNAP—the amount of SNAP benefits a participant could spend—by contrast, the 2016 SNAP benefits expiration led to many of Dollar General's core customers losing their access to SNAP benefits altogether. Thus, on its face, the 2016 SNAP benefits expiration would have at least the same effect on Dollar General's same-store sales growth as the 2013 SNAP benefits reduction—*if not worse.*

### 2. Defendants Misleadingly Reassure Investors About the Effect of the 2016 SNAP Benefits Expiration on Dollar General's Core Customers

123. When Dollar General reported its results for 4Q and FY 2013 on March 10, 2016, investors and analysts were concerned about the effect that macroeconomic factors, for example, the 2016 SNAP benefits expiration, would have on Dollar General's core customers and, in turn, the Company's financial metrics. In particular, the market wanted to see whether Defendant Vasos, a newly appointed CEO, would be able to continue Dollar General's streak of more than 25 consecutive years of growth in same-store sales despite these macroeconomic concerns.

124. As a result, when Defendants announced that they expected the Company's same-store sales to grow by 3% for FY 2016, an acceleration from prior results, and that same-store sales growth would remain stable within a range of 2% and 4% for the foreseeable future, investors and analysts alike were impressed and took comfort in Defendants' repeated assertions of "confidence" in Dollar General's ability to achieve these targets.

125.    When pressed by analysts during the Company's March 10 and March 24, 2016 conference calls as to *how* Dollar General intended to generate 3% growth in same-store sales for FY 2016 and consistently achieve 2% to 4% growth in same-store sales for the foreseeable future, Defendants touted the Company's "merchandizing initiatives" which purportedly were "the strongest" they had seen at Dollar General since the prior SNAP benefit reduction in 2013. In fact, Defendants asserted that Dollar General would achieve the majority of its same-store sales growth through these merchandizing initiatives.

126.    For FY 2016, Dollar General claimed to have four areas of "key merchandising priorities" which the Company publicly represented would "drive sustainable growth." These four areas included: (i) "attract new customers and grow trips," (ii) "capture a higher share of wallet from our existing customers," (iii) "develop optimized store formats that support our merchandising initiatives and unlock real estate opportunities," and (iv) "leverage margin opportunities to continue [its] momentum of profitable growth."

127.    Specifically, to "attract new customers and grow trips," Dollar General sought to "expand ready to consume offerings" in beverages and snacks, including to expanding its sales of refrigerated soft drinks and beer, and claimed that such "investments and initiatives" were "driving comp store sales increases." To "capture a higher share of wallet from [its] existing customers," the Company touted its investment "in category expansions," including so-called "underpenetrated target areas" like "health, beauty," and "non-consumables like party, stationary and home."

128.    Defendants relied upon the implementation of these merchandising initiatives when analysts questioned Dollar General's ability to generate same-store sales growth of 3% for FY 2016 during the May 26, 2016 conference call, given the current macroeconomic conditions.

For example, in response to a question about whether Defendants were "currently" confident that Dollar General could accelerate its same-store sales growth for FY 2016 given "there was a lot of noise in April," Vasos stated, "we have the initiatives in place . . . to ensure that we can keep those comps moving." He continued, telling another analyst, "we feel that we have all of the initiatives we need to make sure we deliver" in same-store sales growth.

129.    In response to Defendants' statements, analysts issued positive reports which deemed the Company's same-store sales growth target "highly achievable *regardless of the macro environment*" and found the Company to be "well positioned from a macro perspective." This was especially so in comparison to Dollar General's competitors, with one analyst touting the fact that "unlike [Dollar Tree], DG appears to have meaningful initiatives in place to reaccelerate comp trends by 2H." Another analyst similarly concluded that Dollar General "enjoy[ed] a model that perform[ed] well regardless of the economic backdrop."

130.    Analysts also remarked on Vasos' "confidence" in the effect of the Company's merchandising initiatives and the fact that these initiatives had purportedly "already exhibited traction," noting that "[s]ame-store sales growth is expected to accelerate throughout FY16 as management continues to implement new initiatives." At least one analyst raised its price target for Dollar General's common stock because it was "encouraged by management's myriad FY'16 initiatives," while another analyst asserted that Dollar General "shares are enjoying a re-rating higher" because the Company "has demonstrated it is insulated from many of the problems plaguing retail."

131.    However, despite the fact that Defendants knew what the likely effects of the 2016 SNAP benefits expiration would be, given their past negative experiences with the 2013 SNAP benefit reduction (i.e., lower sales of SNAP-eligible products, less sales of non-eligible

products by SNAP participants, and overall less foot traffic from SNAP participants), *none* of these initiatives appear to have been designed to promote sales to core consumers who were no longer eligible for SNAP benefits after April 1, 2016.

132. For example, given what had occurred with the 2013 SNAP benefits reduction, Defendants knew that a merchandising initiative that focused on non-eligible products like soft drinks and beer would not protect the Company from the effects of the 2016 SNAP benefits expiration. Indeed, CW 3 confirmed that CW 3's stores in Florida not only saw losses in SNAP-eligible products, but also in non-eligible products such as cigarettes, alcohol, gum, and toys.

133. Likewise, Defendants knew that the category expansions trumpeted by Dollar General in health and beauty products and non-consumables would not mitigate the effects of the 2016 SNAP benefits expiration because these initiatives focused on non-eligible products that its core customers do not purchase when SNAP benefits have been reduced or eliminated. To that end, CW 1 confirmed that the biggest department hit by the 2016 SNAP benefits expiration was health and beauty, noting that SNAP participants bought less shampoo, conditioner, and makeup after the SNAP benefits were reduced.

134. In fact, despite Defendants' constant public reassurance that Dollar General had sufficient merchandising initiatives in place to counteract current macroeconomic pressures on its core customers, CW 1, CW 2, CW 3, CW 4, and CW 5, all confirmed that Dollar General made *no* contact with its stores or field representatives to prepare for the effects of the forthcoming 2016 SNAP benefits expiration, completely undercutting Defendants' asserted confidence in Dollar General's ability to accelerate its rate of same-stores sales growth throughout 2016. For instance, despite the fact SNAP was important enough to Dollar General's sales to provide training on it to new store managers and that the Company typically pushed out

new training programs approximately every other month, CW 2 could not recall any training updates related to SNAP.

135.    Neither CW 1, CW 3, nor CW 4 was ever told by Dollar General HQ about the 2016 SNAP benefits expiration, when the Company expected to see the effects of the expiration (e.g., April 1, 2016), or how to counteract its effects on their stores.  Instead, CW 1 confirmed that the news came from the store managers themselves and Dollar General left it to the district and store managers to figure out how to address the loss of SNAP benefits by the Company's core customers.  As CW 1 explained it, at the end of 2015 and into early 2016, the Company's focus was not on the 2016 SNAP benefits expiration, but on revamping existing stores and adding new locations to compete with Walmart.

136.    This was consistent with CW 4's recollection that there was not a lot of "two-way" communication between Dollar General headquarters and the individual stores, and although CW 4 was provided with a weekly "Seven Day Work Flow" plan which informed the district managers about what to buy, how to stock, staffing needs, and other information, these communications did not discuss SNAP. Moreover, CW 4 did not otherwise receive any reports, emails, or other communications (written or oral) from anyone regarding the 2016 SNAP benefits expiration or its impact on sales.

137.    CW 5 reported that CW 5 received no support from Dollar General to counteract the effects of the 2016 SNAP benefits expiration.  Indeed, CW 5 recalled a March 2016 divisional meeting which CW 5 attended, along with the Division's Vice President, the heads of the Division's loss prevention and human resources departments, and the Division's regional managers, during which SNAP was not discussed.  In fact, according to CW 3, the reaction of the Dollar General executives to the effects of the 2016 SNAP benefits expiration on the

41

Company's results was to point the finger at and blame everyone else below them for not correctly managing the stores.

138.     Defendants' tried to assuage investors' concerns about the effect of macroeconomic changes on Dollar General's core consumer, including the 2016 SNAP benefits expiration, by explaining that SNAP benefit sales were "not a huge piece of [Dollar General's] revenues," in the event that the Company lost its ability to accept SNAP benefits in its stores, and that the Company's core consumer will continue "to come to us" even if "she's pinched a little bit with SNAP."

139.     When asked directly about the *current* mindset of Dollar General's core consumer in May 2016, Vasos told investors that Dollar General does "very well" when its core consumer is under pressure, noting that when the core customer "doesn't have as much" to spend they "may pull back . . . but then utilizes [Dollar General] more on consumables and everyday staples," and confirmed that with respect to the core consumer, the Company was seeing "the same trends" as they did "coming out of Q4." In other words, Vasos confirmed that Dollar General's core consumer was acting the same way in May 2016, after the 2016 SNAP benefits expiration took effect, as she had before the 2016 SNAP benefits expiration in November and December 2013 and January 2016.

140.     Defendants' public statements concealed the reality at Dollar General during the Class Period. As Vasos later admitted in August of 2016, the "*SNAP benefit reduction and/or elimination happened in April, right? That was the kickoff, and you could see it immediately in the numbers.*" In fact, by May 2016, Dollar General already was experiencing undisclosed decreases in same-store sales as a result of the 2016 SNAP benefits expiration. Significantly, CW 5 reported that beginning in March 2016, the year-over-year monthly sales "comps" were

42

negative in many of the Company's regions, including CW 5's region. These negative comps ranged from 18-19% in some of CW 5's stores in South Carolina, to between 5% to 6% and the low double digits in others.

141. Similarly, CW 3 described losses due to the 2016 SNAP benefits expiration at the stores CW 3 managed as a Division Director as "*significant right off the gate in April/May 2016*." These losses, moreover, were not limited to SNAP-eligible products, but included non-eligible products such as cigarettes, alcohol, gum, toys, and other add-on items, according to CW 3.

142. CW 1 recalled that the impact of SNAP was seen in Indiana as early as late 2015/early 2016, where SNAP participants stopped purchasing non-essential goods and were buying less in general. Moreover, the SNAP participants began shopping in the beginning and middle of the month, rather than loading up all of their items in one shopping trip at the beginning of the month.

143. CW 4 likewise confirmed that the 2016 SNAP benefits expiration began affecting stores CW 4 managed in April or May 2016 and continued through September 2016 when CW 4 left the Company. CW 4 received a quarterly bonus based on the percentage of targeted sales CW 4's stores achieved. The minimum qualifying percentage of targeted sales was 98% and the maximum percentage of targeted sales was 105% or above. The sales targets were set by the Finance Department at Dollar General's headquarters and were final (i.e., non-negotiable). CW 4 reported CW 4's understanding of how the targets were set; namely, based on prior year sales with a sales growth percentage built in. The quarterly bonus typically was a cash bonus but, after end-of-the-year evaluations, district managers also were offered a bonus paid out through

43

stock options which had a 36 or 48 month maturity period. CW 2 likewise confirmed that store managers received bonuses based on their stores' sales results.

144. Prior to the 2016 SNAP benefits expiration, CW 4 received a maximum quarterly bonus of $2,250. However, CW 4 received just $300 in March or April 2016 and then $0 in later quarters.

145. Moreover, unbeknownst to the public, investors and analysts, Dollar General was able to at least partially achieve its same-store sales targets by manipulating its same-store sales metric through the process of "relocating" stores. As explained by CW 5, Dollar General would open a brand new store across the street from another store that was underperforming on same-store sales. This brand new store was called a "relocation store." The brand-new "relocation store" would be assigned the same store number as the older, underperforming store located across the street, which then allowed the sales of this brand-new store to be included in the Company's same-store sales metric despite the fact that the store had not been opened for 13 months or more. According to CW 5, new stores started with 20% to 30% mores sales than stores that were old enough to be included within the Company's same-store sales metric.

146. CW 8 confirmed that Dollar General intended to use its efforts to open 1,000 stores per year to maintain the Company's positive results. During CW 8's training in early July 2016, which was run by two trainers, Sam Underwood and Dane Hanslow, and attended by Owen and Senior Vice President of Operations, Steve Sunderland ("Sunderland"), both Sunderland and Owen stated that they were worried about comps in light of the SNAP reduction. When a trainee asked how Dollar General intended to deal with the 2016 SNAP benefits expiration, Owen reassured the trainee that Dollar General intended to "float" numbers and keep

44

shares up by opening more stores (approximately 1,000 per year), which would drive up sales volume.

147.    Over the same period, Dollar General also saw its core consumers' behavior had change drastically—instead of coming in and spending less, Dollar General's core customers whose SNAP benefits had expired simply were not coming into the stores at all.  As CW 3 explained, Dollar General was considered by its customers to be a "secondary trip store," so when SNAP benefits were reduced in 2016, SNAP recipients chose to engage in one big trip to a store like Walmart and then skip the second trip to Dollar General because she did not have any additional funds to spend.

148.    CW 8 confirmed that during CW 8's training session in early July 2016, Owen and Sunderland explained that the decrease in foot traffic as a result of the 2016 SNAP benefits expiration led to lower sales of apparel and other non-consumable products at Dollar General's stores.  CW 8 further confirmed that Dollar General was dealing with inventory overstock issues as a result of the 2016 SNAP benefits expiration.  Specifically, because the Company's inventory was replenished based on year-over-year sales and sales in FY 2015 had been higher, Dollar General was addressing inventory problems brought on by lower sales due to the 2016 SNAP benefits expiration.

149.    CW 4 also reported that, in the spring of 2016, sales at CW 4's urban-based locations declined by 5% to 9% because of the 2016 SNAP benefits expiration, due to a direct loss of SNAP-eligible good sales coupled with the loss of "foot traffic" sales attributable to non-SNAP goods such as cigarettes. CW 4 further confirmed that other district managers in CW 4's region experienced a similar drop in sales at or near the 1st and 15th of each month due to the 2016 SNAP benefits expiration.

150. More specifically, CW 4 recalled attending a national meeting of all district managers, regional managers, and Dollar General corporate executives in Nashville, Tennessee in approximately March 2016. CW 4 also recalled attending a smaller meeting of the regional manager and district manager team in September 2016 in New York. At both of these meetings, CW 4 reported speaking to CW 4's peers about SNAP and how the 2016 SNAP benefits expiration made it "pretty tough" to meet the "comp" or same-store sales targets set by the Company.

151. By the second quarter of FY 2016, the Company reported same-store sales growth had dropped to a mere 0.7%—a number well below expectations—"due to a reduction in both SNAP participation rates and benefit levels."

152. CW 8 reported that during CW 8's training session, Owen told trainees that Dollar General was planning to lower prices for Company-branded products and negotiate lower prices on name-brand items that SNAP participants typically purchased, such as laundry detergents (e.g., Tide) to make up for the loss in sales associated with the 2016 SNAP benefits expiration. In that same training session attended by CW8, Owen also told trainees that Dollar General was seeing lower sales of non-SNAP-eligible products, like alcohol and cigarettes and that the Company's same-store sales metric already were down 10% to 15% year-over-year company-wide and that many of the Company's stores already were missing their same-store sales targets as a result of the 2016 SNAP benefits expiration.

153. By August 2016, Defendants were left with no option but to admit to the market that "the headwind of SNAP for us really was a big deal. And also, our core consumer continues to be under a lot of pressure." Indeed, Defendants explained what they had known all along—that the headwinds the Company had experienced were no different than the prospects of

46

"October of '13 and coming into November of 2013 when the last large SNAP benefit reduction happened, it happened almost exactly the same way on our comps and how we saw traffic" and that Defendants saw the effects of the 2016 SNAP benefits expiration "immediately in the numbers." Nevertheless, Defendants assured investors that "we're going to take aggressive price action to get that consumer back in the store."

154.     On this news, Dollar General's stock price declined $16.18 per share, or more than 17%, from a close of $91.79 per share on August 24, 2016, to close at $75.61 on August 25, 2016.

155.     Thereafter, during a December 1, 2016 earnings conference call, Defendants explained that the reduced and eliminated SNAP benefits "***affects about 56% of our store base . . . [a]nd those states that have had the reduction or elimination, they are approximately 100 basis points worse in comp.***" Defendants further quantified the impact of the SNAP changes on the Company, estimating combined deflation and SNAP headwinds accelerated to a ~150-175 basis point impact to comps in the third quarter, versus 100-115 basis points in the second.

156.     The following chart illustrates the drastic decline in the Company's same-store sales growth due in large part to the 2016 SNAP benefits expiration:



157. Following the earnings call, Dollar General stock price declined $3.84, or nearly 5%, from a close of $77.32 per share on November 30, 2016, to close at $73.48 per share on December 1, 2016. The market finally learned that Dollar General's same-store sales growth has not yet fully recovered from the effects of the 2016 SNAP benefits expiration.

## V. Materially False and Misleading Statements Issued During the Class Period

### A. 4Q 2015 and FY 2015 Earnings

158. On March 10, 2016, Dollar General released its financial results for the three months and fiscal year ended January 31, 2016. In the press release announcing these results ("March 10, 2016 Press Release"), the Company reported same-store sales growth for the year of 2.8%, and stated that Dollar General expected to have annual same-store sales growth of 2% to 4% for the foreseeable future, with a target of 3% growth in same-store sales for FY 2016.

159. On the same day, Dollar General held a conference call with investors ("March 10, 2016 Conference Call") to discuss its 4Q 2015 financial results. During the prepared remarks portion of the call, Defendant Vasos touted the 4Q 2015 same-stores sales increase of 2.8% as the Company's "26th consecutive year of same-store sales growth." Vasos also confirmed the target of 2% to 4% same-store sales improvement for the Company, stating that for FY 2016, Dollar General "anticipate[s] that same-store sales growth will be near the middle of the model's 2% to 4% growth rate."

160. Following their prepared remarks, Defendants answered analysts' questions. For example, Peter Jacob Keith, a Piper Jaffray analyst, inquired as to whether (i) there were any "company-specific initiatives" which "will help get" Dollar General to 3% in same-store sales growth for FY 2016 and (ii) Defendants saw "something on the macro front or even near-term that looks encouraging," given that 3% same-store sales increase for FY 2016 "suggests some

acceleration" from "the last two quarters" where the Company was "running in the low 2s." In response, Defendant Vasos stated:

> I think as you look at this, first of all, I want to say our merchandise initiatives should gain traction as it goes through the year. The laps were a little tougher in the beginning of the year and get a little easier towards the back. But make no bones about it, *our initiatives that we've got this year are the strongest that I've seen here in the last 2 to 3 years.* Not only the perishable that I just talked about, but as I talked about in my prepared remarks, *our health and beauty initiative as well as our party and stationary pieces really should help drive some of those initiatives as we go forward.* You couple that with the work that our operators are doing on on-shelf availability and making product available when the consumer comes in the door at a very high rate, we think that guiding in where we did makes a lot of sense. *But we feel very confident as we go forward this year into 2016 where that comp is headed.*

161. Defendant Vasos also engaged in a question and answer dialogue with Barclays' analyst, Meredith Adler, regarding the effect of the FDA's proposed changes to the qualifications for companies allowed to receive SNAP benefits. In particular, Adler sought reassurance that: (i) sales utilizing SNAP benefits were "not a huge piece of [Dollar General's] revenues;" and (ii) the Company could "adjust [its] offerings if [it] need[s] to, to satisfy any new rules," which Defendant Vasos provided:

> ADLER: Okay, great. And then just a quick question about SNAP, which I know is not a huge piece of your revenues. But I think the FDA is talking about making some changes to qualifying for SNAP. And I'm wondering if you guys are looking at that? And kind of what you think that means for your business?
>
> VASOS: Yes, Meredith, we are watching that. And we, as you know, and you mentioned earlier, SNAP for us is approximately 5% of our sales. *So it really has - it's not a huge piece of the business,* but yet, our core consumer does rely on SNAP benefits in a lot of cases. But in saying that, the great thing here about Dollar General, and we'll continue to monitor it, is that we offer her a great value proposition at the price. *So whether she's pinched a little bit with SNAP or not, she can definitely come here to Dollar General and get all her needs. And we'll continue to deliver on that promise to her because she actually comes to us to make sure we can deliver on it.*

162. Following the March 10, 2016 earnings release, analysts issued reports regarding the Company's results, many of which concluded that the reported and projected same-store

sales figures were important to investors and that Dollar General was well-equipped to handle any changes to the macro environment.

163.    For example, on March 10, 2016, Buckingham Research Group issued a report noting that Dollar General had reported a same-store increase in excess of consensus and finding that "[m]ost important for the stock today, in our view, is the company's comp [same-store sales] performance and outlook."   Likewise, Credit Suisse's March 10, 2016 report cited the Company's FY 2016 "comps" "at the mid-point of the range" of 2% to 4% which was "clearly encouraging," and noted that Dollar General "beat consensus in Q4 and set attractive long-term financial targets, a move that should further help the new CEO establish credibility with the market."  As Credit Suisse concluded, Dollar General's FY 2016 "goals [are] highly achievable **regardless of the macro environment** given the defensive growth nature of the story."

164.    BMO Capital issued a report on the same date describing Dollar General's "long-term outlook" as "better-than-expected" and, with respect to Dollar General's expected 2% to 4% same-store sales growth for FY 2016, noting the Company's "outlook calls for acceleration in comp growth to 3% and above, which will be driven by merchandise initiatives that have already exhibited traction."   Jefferies also issued a report on March 10, 2016, confirming that Dollar General's management "expresse[d] confidence in comp store sales acceleration . . . point[ing] to better comp store sales ahead, reflecting a number of merchandising initiatives and better in-stocks."   According to Jefferies, "[j]udging from the tone of the [March 10, 2016 Conference Call], it sound[ed] like the year [wa]s starting off well."

165.    With respect to the impact of the "macro environment" on Dollar General, which included the effects of the reduction and elimination of SNAP benefits on the Company's core

customers, Morgan Stanley issued a March 10, 2016 report which found that Dollar General was "well positioned from a macro perspective."

166.    Another analyst, Telsey Advisory Group, issued a March 10, 2016 report stating that it "remain[ed] positive on Dollar General, given its consistent operations," including "positive same-store sales" for non-consumables "for the eighth consecutive quarter," and "continue[d] to be confident in Dollar General's long term business model . . . given benefits from initiatives such as  . . . the use of data analytics and customer insights, as well as customer segmentation to improve demand forecasting and target promotions."

167.    In a follow-on report dated March 11, 2016, UBS described "[t]he market's response to" Dollar General's 4Q 2015 results as "powerful," noting "how willing [the market] is to reward" the Company's "ability to produce a stable P&L" and that Dollar General "delivered on its promise with a 2.2% comp [same-store sales increase] that was better than feared." UBS also labeled the FY 2016 numbers, including the 2% to 4% same-store sales increase, as both "achievable and impressive."

168.    The statements referenced above in ¶¶ 160-161 were materially false and/or misleading because at the time Defendants reassured investors that: (i) SNAP was "not a huge piece of the business;" (ii) if Dollar General's core customer was "pinched a little bit with SNAP" she still shopped at its stores; and (iii) they were "very confident" about "where the comp is headed" because of the strength of Dollar General's initiatives, Defendants knew or were severely reckless in not knowing at least the following:

(a)    purchases by SNAP *participants* accounted for far more than 5% of the Company's sales because, as the various transaction and store-level reports demonstrated, SNAP participants typically purchased both SNAP-eligible

products with SNAP benefits and non-eligible products with additional, discretionary income in the same transaction and, if SNAP participants spent less or failed to shop at Dollar General, these losses would affect more than 5% of Dollar General's sales;

(b) when Dollar General's core customer received less SNAP benefits, she did not shop at the Company's stores, choosing instead to make one trip to a larger competitor, such as Walmart;

(c) the 2013 SNAP benefits reduction had adversely affected Dollar General's same-store sales for at least 4Q 2013 and 1Q 2014, by limiting the amount of SNAP benefits the Company's core customer could spend and, in turn, causing core customers to either spend less at Dollar General or avoid shopping at its stores altogether;

(d) the 2016 SNAP benefits expiration, which was announced in 2015 and would begin to affect the Company's core customers on April 1, 2016, would have an adverse effect on Dollar General's same-store sales that was equal to or, given the total loss of SNAP benefits for ABAWDs, more likely *worse* than the 2013 SNAP benefits reduction;

(e) none of the initiatives outlined by Defendants would address the effects of loss of SNAP benefits on Dollar General's core customer and, despite the 2016 SNAP benefits expiration, encourage these customers to shop at Dollar General or to spend their discretionary income at the Company's stores after April 1, 2016; and

(f) Defendants had, in fact, done *nothing* to alert managers in the field about the 2016 SNAP benefits expiration, its effects, or put into place any action plans to

ensure that the Company did not lose the foot traffic of and purchases by the Company's core customers who lost their SNAP benefits.

**B.**     **1Q 2016 Earnings**

169.     On May 26, 2016, the Company announced its 1Q 2016 financial results, which included same-store sales growth of 2% for the quarter.

170.     On the same day, the Company held a conference call to discuss the Company's 1Q 2016 financial results ("May 26, 2016 Conference Call").  During the prepared remarks portion of the conference call, Defendant Vasos stated, "[I]n an environment where many retailers struggled, we delivered good performance," and touted "positive" same-store sales growth "for both consumables and non-consumables" and the fact that Dollar General had "increased" its "customer traffic" for the "33rd consecutive quarter."

171.     After his prepared remarks, Defendant Vasos responded to questions from analysts regarding the Company's core customer and changing economic conditions.  For example, Defendant Vasos addressed a question from Citi analyst, Alvin Concepcion**,** regarding "second-quarter same-store sales trends." Specifically, Mr. Concepcion asked, "[i]t sounds like there was a lot of noise in April with Easter shift and weather, so I am wondering if you can give us a sense of how things are currently working?  And related to that, I think you previously expressed confidence that you can accelerate comps to the 3% range for the year.  Is that still your view?"  In response, Vasos stated:

> [a]gain, when you look at it, the quarter ended up exactly the way we thought it would from a shape perspective, exactly the way we planned it. ***And again, we really feel confident longterm and we look at this longterm that, in fact, we have the initiatives in place and we have the strategic planning already moving forward to ensure that we can keep those comps moving as we go through this year and in the years to come. So again, we're confident in that 2% to 4%, that guard rail that we've put up, and we want to just continue to move through that.***

172.    Similarly, in response to a question by Raymond James analyst, Dan Wewer, regarding "a realistic time frame from when that type of same-store sales growth [as strong as 4%] could become visible," Vasos stated:

> when we look and we put this algorithm together, *we feel very confident over the long-term that we could stay within those guardrails of 2% to 4%.* And the initiatives that are just now rolling out in 2016, the majority of them are just now starting to roll out and will continue to roll out in Q2 and into Q3 and start to come to fruition even greater in the  [Q]3 and Q4.  And then as I indicated, we're further along on our strategic planning right now than we've been in the last 8 years here.  And that gives me great solace that as we continue to move into '17 and beyond, that they'll be a very robust initiatives going forward to drive that top line. So *we're very confident in the 2% to 4%.*  And there will be ebb and flow in there, but *we feel that we have all the initiatives we need to make sure we deliver that.*

173.    Dan Wewer followed up by asking a question about the "current economic environment for [the Company's] core customer" and whether it was "sufficient for Dollar General same-store sales to get in the, I'd say, 3.5% to 4% rate?  Or does some macro improvement … that will be needed to get to that kind of objective?"  Vasos responded:

> "[w]hen you look at our core consumer today, she's always under pressure as I indicated. Her income and her spending rates are usually under pressure. The great thing about our model is *we do very well in either of those 2 scenarios*, where she has a little bit more money, she spends a little bit more on those nonconsumable goods. And when she doesn't have as much, you may pull back there, but *then utilizes this more on consumable and everyday staples that she knows she can get at an everyday low price*.

174.    Likewise, in response to Credit Suisse analyst, Ed Kelly's request for "insight in terms of what you're seeing from the consumer at this point," Vasos stated: "Yes.  When you look at it, *the consumer is probably about the same as they were coming out of Q4, to be honest with you. We're seeing about the same trends*."

175.    Also on May 26, 2016, Dollar General filed its 1Q 2016 financial results with the SEC on Form 10-Q.  With respect to the 1Q 2016 Form 10-Q, Defendant Vasos certified:

Because the customers we serve are value-conscious, many with low or fixed incomes, we are intensely focused on helping them make the most of their spending dollars. We believe our convenient store format and broad selection of high-quality products at compelling values have driven our substantial growth and financial success over the years. Like other retailers, we have been operating for several years in an environment with ongoing macroeconomic challenges and uncertainties. Our core customers are often among the first to be affected by negative or uncertain economic conditions such as unemployment and fluctuating food, energy and medical costs, and are among the last to feel the effects of improving economic conditions. ***Our customer has experienced both positive and negative general economic factors*** during 2015 and ***to date in 2016, such as lower gasoline prices and unemployment rates coupled with rising rents and medical costs and lagging wage growth.*** The overall financial impact of these factors to our customers has been inconsistent and their duration is unknown.

176.    On the same day, multiple analysts issued reports reiterating Defendants statements concerning Dollar General's same-store sales results and current take on the environment for its core customers.  For example, BB&T issued a report "bumping up" its "price target" for Dollar General stating that it was "encouraged by management's myriad FY'16 initiatives."  Piper Jaffray issued a same-day report noting that "DG suggested the comp trend should accelerate as the year progresses" and "unlike [Dollar Tree], DG appears to have meaningful initiatives in place to reaccelerate comp trends by 2H."  Credit Suisse also issued a same-day report noting that "[m]anagement's tone on the [May 26] call was positive, and there seem[ed] to be a number of initiatives rolling out that could drive somewhat better top line momentum."

177.    RBC Capital concurred in its May 26, 2016 report that "management was particularly upbeat regarding the early results of its ongoing growth initiatives for 2016," noting that "the company saw another quarter with" customer "traffic growth."  Macquarie Research's May 26, 2016 report included its conclusion that "same-store strength will continue" and "[s]ame-store sales growth is expected to accelerate throughout FY16 as management continues to implement new initiatives."

178. BMO Capital issued a May 26, 2016 report identifying Dollar General's purported "well-balanced SSS growth between traffic and ticket, with the 2016 outlook assuming an acceleration to 2.8%" as a "positive takeaway" from the Company's 1Q 2016 results and conference call. The Buckingham Research Group likewise issued a same-day report concluding that "[t]he first quarter reinforced [its] view of DG as a company with less volatility in demand and solid execution in a market where concerns over channel shift and secular changes in spending priorities have hurt the shares of many retailers. DG also enjoys a model that performs well almost regardless of the economic backdrop." The Buckingham report further stated that it "believe[d] DG shares are enjoying a deserved re-rating higher as the company has demonstrated it is insulated from many of the problems plaguing retail including channel shift, secular shifts in consumer spending, and weather sensitivity."

179. The statements referenced above in ¶¶ 171-175 were materially false and/or misleading because at the time Defendants reassured investors that: (i) Dollar General has "the initiatives in place . . . to ensure that" the Company can "keep those comps moving" and "all the initiatives we need to make sure we deliver" same-store sales growth of 2% to 4%; (ii) Dollar General does well when its core customer's "spending rates are . . . under pressure;" (iii) when Dollar General's core customer "doesn't have much, [she] may pull back . . . but then utilizes" the Company's stores more for "consumable and everyday staples;" (iv) they are seeing the "same trends" with respect to Dollar General's core customers as they did "coming out of Q4;" and (v) the negative economic factors weighing on its customer were "rising rents and medical costs and lagging wage growth;" Defendants knew or were severely reckless in not knowing at least the following:

(a)     when Dollar General's core customer received less SNAP benefits, she did not shop at the Company's stores, choosing instead to make one trip to a larger competitor, such as Walmart;

(b)     the 2013 SNAP benefits reduction had adversely affected Dollar General's same-store sales for at least 4Q 2013 and 1Q 2014, by limiting the amount of SNAP benefits the Company's core customer could spend and, in turn, causing core customers to either spend less at Dollar General or avoid shopping at its stores altogether;

(c)     the 2016 SNAP benefits expiration, which began affecting the Company's core customers on April 1, 2016, had an immediate and significant adverse effect on Dollar General's same-store sales beginning in March 2016 and continuing in April and May 2016, including a decline in foot traffic and same-store sales growth attributable to the purchase of both SNAP-eligible and non-eligible products by SNAP participants;

(d)     none of the initiatives outlined by Defendants addressed the effects of loss of SNAP benefits on Dollar General's core customer and failed to encourage these customers to shop at Dollar General or to spend their discretionary income at the Company's stores after April 1, 2016 in spite of the 2016 SNAP benefits expiration;

(e)     Defendants had, in fact, done ***nothing*** to alert managers in the field about the 2016 SNAP benefits expiration, its effects, or put into place any action plans to ensure that the Company did not lose the foot traffic of and purchases by the Company's core customers; and

57

(f)     in order to combat the effects of the 2016 SNAP benefits expiration, Defendants were manipulating the Company's same-store sales metric by opening up new stores across the street from older, underperforming stores, and transferring the store number of the latter store to the new store so that the new stores sales could be included in the same-store sales growth metric.

## VI. Defendants Failed to Comply With Item 303 of Regulation S-K By Failing to Disclose Material Known Trends in the 1Q 2016 Form 10-Q

180.    SEC Regulation S-K requires that every Form 10-Q filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K. The SEC describes the purposes of MD&A in Financial Reporting Release 36:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

This requirement was reaffirmed in SEC Staff Accounting Bulletin No. 101, *Revenue Recognition in Financial Statements*, (Dec. 1999).

181.    Item 303 of SEC Regulation S-K together with SEC Staff Accounting Bulletin No. 101 required Defendants to disclose in the MD&A section of its quarterly filings:

> any known *trends or uncertainties* that *have had* or that the registrant *reasonably expects will have* a material favorable or unfavorable impact on *net sales or revenues or income* from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of . . . materials or price increases or inventory adjustments), the change in the relationship *shall be disclosed*.

17 C.F.R. § 229.303 ("Regulation S-K" and/or "Item 303").

182.     The SEC has clarified what constitutes a "trend" that gives rise to Item 303's duty to disclose:

> [R]equired disclosure regarding the future impact of presently known trends, events or uncertainties…may involve some prediction or projection. The distinction between the two rests with the nature of the prediction required. Required disclosure is based on ***currently known trends, events, and uncertainties that are reasonably expected to have material effects***, such as: [a] reduction in the registrant's product prices; erosion in the registrant's market share . . . or the likely non-renewal of a material contract.

*See* SEC Interpretation: Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, Release No. 33-6835 (May 18, 1989).

183.     Dollar General's 1Q 2016 Form 10-Q omitted material information regarding material trends and uncertainties that Defendants were required to disclose pursuant to Regulation S-K, Item 303. Defendants knowingly and/or recklessly failed to comply with Regulation S-K by failing to disclose that, prior to the issuance of the 1Q 2016 Form 10-Q, the 2016 SNAP benefits expiration was causing a significant decline in foot traffic by SNAP participants and same-store sales growth attributable to the purchase of both SNAP-eligible and non-eligible products by SNAP participants.  As a result of this material, undisclosed, and adverse trend, Dollar General's same-store sales were significantly and adversely affected in at least April and May 2016.

184.     In light of Defendants' extensive knowledge of the foregoing, Defendants had a duty to disclose the currently-known, pervasive, and adverse industry trends in the 1Q 2016 Form 10-Q.  Therefore, in light of the foregoing, Defendants failed to comply with Regulation S-K by omitting these known trends, events, transactions, commitments, or uncertainties that were

known to Defendants and were reasonably likely to have a material effect on the Dollar General's financial condition or results of operations.

## VII.    LOSS CAUSATION AND EMERGENCE OF THE RELEVANT TRUTH

185.    As a result of Defendants' materially false and misleading statements, omissions of material facts, and fraudulent course of conduct, as alleged in ¶¶ 160-161, 171-175, *supra*, Dollar General's publicly traded common stock traded at artificially inflated prices during the Class Period.  Specifically, Defendants' misrepresentations and omissions regarding the effects of the 2016 SNAP benefits expiration on the Company's core customer and its corresponding effect on the Company's same-store sales, caused and/or maintained the artificial inflation in Dollar General's stock price during the Class Period.

186.    Relying on the integrity of the market price for Dollar General common stock and public information relating to Dollar General, Lead Plaintiff and other Class members purchased or otherwise acquired Dollar General common stock at prices that incorporated and reflected Dollar General's misrepresentations and omissions of material fact alleged herein.  As a result of their purchases of Dollar General common stock during the Class Period at artificially inflated prices and the removal of that inflation upon the partial disclosures set forth in ¶¶ 191-195, 200-202, *infra*, Lead Plaintiff and the Class suffered economic losses, *i.e.*, damages under the federal securities laws.

187.    Defendants' false and misleading statements, material omissions and course of conduct had their intended effect, directly and proximately causing Dollar General common stock to trade at artificially inflated prices during the Class Period, including as high as $96.71 per share on July 26, 2016.  Those misrepresentations and omissions of material fact that were not immediately followed by an upward movement in the price of Dollar General common stock served to maintain the price of Dollar General common stock at an artificially inflated level.

188.    Had Dollar General been truthful about these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired their Dollar General securities at the artificially inflated prices at which they traded.  It was entirely foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Dollar General common stock.

189.    The economic losses, *i.e.*, damages, suffered by Lead Plaintiff and other members of the Class were a direct, proximate, and foreseeable result of Dollar General's materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's common stock, and subsequently caused a significant decline in the value of the Company's common stock when the relevant truth was revealed and/or the risks previously concealed by Defendants' material misstatements and omissions materialized.

190.    Defendants' false and misleading statements and omissions about the effects of the reduction and elimination of SNAP benefits on the Company's core consumer, and its corresponding effect on the Company's same-store sales, caused and/or maintained the artificial inflation in Dollar General's stock price throughout the Class Period until the relevant truth concealed and/or obscured by Defendants' misconduct was revealed to the market.  These revelations occurred through at least two partial corrective disclosures on:  August 25, 2016 and December 1, 2016, as detailed below in ¶¶ 191-195, 200-202.  The timing and magnitude of the declines in the price of Dollar General common stock, as detailed herein, negate any inference that the loss suffered by Lead Plaintiff and the Class was caused by changed market conditions or other macroeconomic factors unrelated to the revelation and materialization of Defendants' fraudulent misstatements and omissions.

### A.     August 25, 2016 Partial Corrective Disclosure

191.     On August 25, 2016, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period began to be revealed and/or partially materialized.  On that date, Dollar General issued a press release announcing its 2Q 2016 results, which fell short of the Company's and market expectations. In the press release, the Company announced disappointing same-store sales growth of just 0.7% for the quarter, which it attributed to "a reduction in both SNAP participation rates and benefit levels."  To address the unexpected decline in its same-store sales growth, Defendant Vasos stated that Dollar General had put into place "action plans across both merchandising and store operations intended to drive same-store sales."

192.     Also on August 25, 2016, the Company held a conference call to discuss its 2Q 2016 results.   During his prepared remarks, Vasos explained that the "[k]ey factors that negatively impacted our expected same-store sales performance included," among other things, "*a reduction in both SNAP participation rates and benefit levels*." Vasos further noted that, "the headwinds from price deflation and the ***reduction in SNAP benefits*** negatively impacted our same-store sales for the second quarter by approximately ***60 to 70 basis points***." Vasos also confirmed that the "cumulative effect of macroeconomic factors such as reduction in SNAP participation and benefit levels" took "a noticeable toll" on Dollar General's core customer's spending.

193.     Following his prepared remarks, Vasos took questions from analysts.  In response to a question from Raymond James analyst Dan Wewer regarding "the drop in customer transactions per store," Vasos stated:

> ***When we look at it, the headwind of SNAP for us really was a big deal.  And also, our core consumer continues to be under a lot of pressure***. I know that when we look at globally the overall U.S. population, it seems like things are

getting better. But when you really start breaking it down and *you look at that core consumer that we serve* on the lower economic scale that's out there, that demographic, *things have not gotten any better for her, and arguably they're worse.* And they're worse because rents are accelerating. Healthcare is accelerating on her at a very, very rapid clip. And now *you couple that upwards of 20 states where they have reduced or eliminated the SNAP benefit,* and it has really put a toll on her. *That SNAP benefit reduction and/or elimination happened in April, right? That was the kickoff, and you could see it immediately in the numbers.* So I believe that those are the things that are affecting her today, again, our core customer. And *by the way, we've seen this play out before.*

194.    Vasos noted that the 2016 SNAP benefits expiration was one "of the biggest headwind[s]" for the Company. Vasos also confirmed that the 2016 SNAP benefits expiration had affected the Company in *"almost exactly the same way on our comps"* as the 2013 SNAP benefits reduction, which caused Dollar General's "traffic [to] slow[] tremendously" similar as it did in reaction to the 2013 SNAP benefit reduction. But, in contrast to how the Company addressed the 2013 SNAP benefit reduction, Vasos stated that Dollar General was "going to take aggressive price action to get the consumer back in the store."

195.    The Company issued a Form 10-Q for 2Q 2016 on the same day. In its 10-Q, the Company noted that its "core customer has experienced both positive and negative general economic factors during the first half of 2016, such as . . . a continued reduction in governmental Supplemental Nutrition Assistance Program participation rates and benefit levels and stagnant wage growth." Notably, while the macroeconomic factors adversely affecting the Company's core customer was consistently discussed in Dollar General's SEC filings, this was the first time SNAP was listed as one of those factors during the Class Period.

196.    The effect of the 2016 SNAP benefits expiration on the Company's core consumer, and its corresponding effect on same-store sales growth, was a foreseeable consequence of the Defendants' misrepresentations and omissions concerning: (i) the overall

impact of the 2016 SNAP benefits expiration on Dollar General; (ii) the Company's ability to achieve its FY 2016 same-store sales growth target of 3% through merchandising initiatives; and (iii) Dollar General's ability to mitigate any negative effects from the SNAP reduction and elimination through targeted initiatives.  Moreover, the August 25, 2016 disclosures revealed new information that Defendants' misstatements, omissions and fraudulent course of conduct previously concealed and/or obscured from the market.  These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the SNAP reduction and elimination.

197.    As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by the Defendants' fraud, Dollar General's stock price declined $16.18 per share, or 18%, from a close of $91.79 per share on August 24, 2016, to a close of $75.61 on August 25, 2016 on extremely heavy volume, thereby partially removing a portion of the artificial inflation in Dollar General common stock.

198.    Analysts attributed the 18% decline to the Company's admission that the 2016 SNAP benefits expiration had taken a noticeable toll on its core consumer and same-store sales growth similar to the effects of the 2013 SNAP benefits reduction, and expressed disappointment that the Company's same-store sales growth had missed Company guidance and consensus estimates.  For example, on the day of the Company's disclosure, Morgan Stanley stated that "[t]he stock is likely to be down today, as headline 2Q comps were below plan" due in part to "SNAP reductions."  Similarly, in an August 25, 2016 article entitled "Dollar Store Chains Tumble After Food Stamp Cuts Hamper Sales," *Bloomberg* reported that Dollar General "tumbled" with disappointing sales, which was "a sign that cuts in food-stamp programs are taking a toll."  Also on August 25, 2016, Credit Suisse issued a report stating that the "comp

miss (+0.7% vs. a consensus of +2.7%) on negative traffic was a clear disappointment" and noting that Dollar General had highlighted "SNAP as [one of] the largest top line issues." On the same day, Piper Jaffray issued a report finding that "SNAP benefit cuts," among other issues "resulted in DG's first negative traffic comp quarter in years." JP Morgan likewise stated "traffic turns negative for 1st time since FY07" based in part on "reduced SNAP benefits (actions taken April 1 in 22 states)."

199. Despite this partial disclosure of adverse news, which removed some of the artificial inflation in Dollar General's stock price, its stock price remained artificially inflated because the market remained unaware of the extent to which the 2016 SNAP benefits expiration effected Dollar General's same-store sales for 2Q 2016 and would continue to severely affect the Company's financial results.

### B. December 1, 2016 Further Corrective Disclosure

200. On December 1, 2016, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were further revealed and/or materialized. On that date before the market opened, Dollar General issued a press release announcing its 3Q 2016 results, which again fell short of market expectations. In the press release, the Company announced a same-store sales *decrease* of 0.1% for the quarter due, in large part, to "an acceleration in headwinds from . . . reductions in SNAP benefits in the 2016 third quarter as compared to the 2016 second quarter." Significantly, this was the first quarterly *decrease* in same-store sales in 34 quarters.

201. During the Company's conference call with investors the same day ("December 1, 2016 Conference Call"), Vasos not only admitted that the impact from the 2016 SNAP benefits expiration had gotten worse in the third quarter, but also that the effect of the 2016 SNAP benefits expiration on 2Q 2016 was far worse than previously reported. Instead of negatively

impacting 2Q 2016 same-store sales by 60 to 70 basis points, the combined effects of the 2016

SNAP benefits expiration and retail price deflation "negatively impacted [the Company's] same-

store sales . . . by approximately 100 to 115 basis points." In fact, Vasos stated:

> [W]hen we look at our SNAP affected states… I'll give you a little color. Really, what's interesting here is a lot like Q2, Q3 was pretty close to about the same. But if you look at it, *it affects about 56% of our store base in the states that have reduced or eliminated these SNAP benefits. And those states that have had the reduction or elimination, they are approximately100 basis points worse in comp*. That gives you a real good idea of how impactful those SNAP benefits reductions have been.

202.    On the same day, the Company released its Form 10-Q for 3Q 2016. In its 3Q

2016 Form 10-Q, the Company disclosed that "[t]he primary macroeconomic factors that affect

our core customers include . . . changes to certain government assistance programs, such as the

2016 changes to the Supplemental Nutrition Assistance Program, which had the effect of not

only reducing benefit levels but also eliminating benefit eligibility for certain individuals." The

3Q 2016 10-Q was clear: "the overall effect of the factors listed above have negatively affected

our traffic and, along with deflationary pressures, including both lower commodity costs and

pricing actions on our products, have negatively affected same-store sales."

203.    The effect of the SNAP reduction on the Company's core consumer and its

corresponding effect on its bottom line, including its reduced same-store sales, was a foreseeable

consequence of the Defendants' misrepresentations and omissions concerning: (i) the overall

impact of the 2016 SNAP benefits expiration; (ii) the Company's ability to achieve its target of

3% same-store sales growth for FY 2016; and (iii) Dollar General's ability to mitigate any

negative effects from the 2016 SNAP benefits expiration through targeted merchandising

initiatives. Moreover, the December 1, 2016 disclosures revealed new information that

Defendants' misstatements, omissions and fraudulent course of conduct previously concealed

and/or obscured from the market. These disclosures further revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the SNAP benefit reductions.

204. As a direct and proximate result of these further corrective disclosures and/or materializations of foreseeable risks concealed by the Defendants' fraud, Dollar General's stock price declined $3.84, or 5%, from a close of $77.32 per share on November 30, 2016, to close at $73.48 per share on December 1, 2016 on extremely heavy volume. These disclosures further removed additional artificial inflation in Dollar General common stock.

205. Analysts attributed the 5% decline in the price of Dollar General's common stock to the continuing impact of the 2016 SNAP benefits expiration on the Company's core consumer, and expressed disappointment that the Company's negative same-store sales growth had missed Company guidance and consensus estimates once again. For example, on December 1, 2016, Morgan Stanley commented that "the -0.1% comp," which was the result of "acceleration in headwinds from retail food deflation and reductions in SNAP benefits," "will likely weigh on shares today." Similarly, on the same day, MKM Partners reported: "*3Q16 results were weaker than expected* as the impact from food price deflation accelerated and as DG's core customer continued to deal with the impact from *SNAP cutbacks/eliminations in roughly 20 states (affects more than 55% of the chain)*."

206. Also on December 1, 2016, *Reuters* reported that "Dollar General (DG.N) reported a *surprise* drop in quarterly comparable sales and tempered its full-year profit forecast…" *Reuters* explained that "[d]iscount retailers have also been hit by changes in the Supplemental Nutrition Assistance Program (SNAP), formerly called the food stamp program. By the end of 2016, 22 states would have changed the criteria for SNAP - which is likely to

67

result in as many as 1 million Americans losing benefits. States implementing SNAP changes this year include Florida, Georgia, Alabama and Tennessee, which have some of the highest concentration of Dollar General stores."

207.    On the same day, Guggenheim Securities wrote: "We had anticipated a 3Q sales shortfall on ongoing deflation/SNAP challenges but we also expected the company to manage margins better and deliver a modest EBITDA beat versus lowered expectations.  This did not occur as increased gross margin pressure drove a slight decline in EBITDA.  In light of updated guidance, consensus estimates appear likely to drop by 2% in 2016 and 4% in 2017.  The shares are off 8% this morning to $71 (vs. flat S&P), are unlikely to hit the prior $67-68 bottom, but probably won't rebound back to $75-80 as quickly, in our view.  *Investor confidence in the secular algorithm has been impacted*."

208.    Also on December 1, 2016, Morgan Stanley reported: "As expected, *certain headwinds continued in 3Q*. Recall last quarter, management cited (by order of magnitude) food deflation and SNAP reductions, mild weather, and increased competition in select regions. Noting a broader view of average unit retail (AUR) price deflation, management estimates combined deflation and *SNAP headwinds accelerated to a ~150-175bp impact to comps in 3Q, versus 100-115bps in 2Q*.  For further color, DG noted that ~56% of its stores are in states with reduced or eliminated SNAP benefits – these stores had ~100bps lower comps.  The competitive environment seems relatively consistent to last quarter, and weather was not a factor in 3Q."

209.    Similarly, on December 1, 2016, Jeffries reported: "*Management still believes its sluggish sales are rooted in a distressed lower income consumer, which is faced with rent and healthcare cost pressures as well as SNAP reductions (56% of the store base was negatively affected with SSS lower by 100 bps in those stores)*.  As we noted above, we think it has more to

do with a change in consumer behavior as customers do more stock-up trips, as well as increased competition."

210.     In sum, as a result of the corrective disclosures on August 25, 2016 and December 1, 2016, which revealed previously misrepresented and concealed material information, and the corresponding substantial declines in the price of Dollar General common stock, Lead Plaintiff and the Class suffered millions of dollars in economic loss.

## VIII.  SCIENTER ALLEGATIONS

211.     As more fully alleged above, numerous facts give rise to a strong inference that, throughout the Class Period, Defendants knew or were deliberately reckless in not knowing that the statements identified above concerning the impact on the Company of the 2016 SNAP benefits expiration were materially false and misleading when made and/or omitted material facts necessary to make those statements not misleading.  In particular, Defendants: (i) knew and/or recklessly disregarded that the public documents and statements issued and disseminated in the name of the Company were false and misleading; (ii) knew that these statements or documents were issued and disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.

212.     As set forth herein, Defendants participated in the fraudulent scheme by means of their control over and receipt or dissemination of the Company's materially false and misleading statements, and their associations with the Company that made them privy to material nonpublic information about Dollar General.

**A.** **The Sheer Amount of Data Analytics Performed by and Available to Defendants on a Real-Time Basis Supports a Strong Inference of Scienter**

213. As detailed above, Defendants' detailed capture and analysis of data and reports about: (i) trends affecting its sales, including changes in SNAP; (ii) the productivity of its inventory, including SNAP-eligible items; and (iii) the habits and preferences of its core customers, on a real-time basis throughout 2016, supports a strong inference that Defendants knew or were deliberately reckless in not knowing that the 2016 SNAP expiration would cause and, in fact, did cause Dollar General's same-store sales growth to significantly decline, beginning no later than April 2016. Defendants' access to this comprehensive and meticulous real-time data demonstrates their knowledge of the Company's business and operations.

214. Specifically, one of the key hallmarks of Dollar General's business model was its purported ability to extract granular detail on *every single* transaction made in *every single* one of its stores on *every item* it sold, and use that data to analyze trends, diagnose the factors affecting its sales, and, importantly, act to address those trends and the effects on Dollar General's financial results. As Defendants repeatedly touted to the public during the Class Period, the Company employed a "data driven statistical approach to operations" – a "Moneyball" approach, so to speak, which meant that "the results that [Dollar General] achieve[d]" were "not surprises." In fact, as Owen explained to investors at the March 24, 2016 Investor Day conference, *"[w]e know what we're going to achieve before we ever implement."*

215. To that end, Dollar General captured daily data about each SNAP transaction through the Company's POS system. From this data, the individual stores generated daily Tender and Sale Reports that included the following metrics: (i) total number of SNAP items sold; (ii) total dollar amount of SNAP sales; (iii) total number of non-SNAP items sold; (iv) total dollar amount of non-SNAP sales; (v) average number of items per transaction (SNAP & non-SNAP);

and (vi) average dollars spent per transaction (SNAP & non-SNAP). Individual stores also generated weekly Store Summary reports every Wednesday, and monthly P&L statements, both of which allowed the recipient of the report to filter it by the "method of payment" to identify the sales that involved SNAP benefits.

216.    The data captured on a daily, weekly, and monthly basis would have reflected that, beginning in April 2016, the Company's year-over-year monthly sales "comps" were suffering in the regions affected by and due to the 2016 SNAP benefits expiration.  The sales in CW 5's stores, for example, were down as low as 18-19% in some stores in South Carolina, to between 5% to 6% and the low double digits in others.  CW 3 similarly described losses due to the 2016 SNAP benefits expiration at the stores CW 3 managed as "significant right off the gate in April/May 2016."  CW 4 likewise confirmed that the 2016 SNAP benefits expiration began effecting stores CW 4 managed in April or May 2016 and continued through September 2016 when CW 4 left the Company.  Indeed, Defendant Vasos confirmed on August 25, 2016 that Defendants saw the effect of the 2016 SNAP benefits expiration *"immediately in the numbers."*

217.    The reports and data, which included information about declining same-store sales, were available to the individual store managers via Storenet, to district and regional managers through a "dashboard," the performance-indicating KPI app, or in-store through Storenet, and to Company headquarters through Storenet and Audit Works.

218.    The reports and data also were discussed at the corporate-level once a week during Weekly Sales Meetings. During these meetings, Company management, including the CFO and, on occasion, the CEO, discussed actual and forecasted sales for the month, and analyzed sales data from the previous week. The meeting participants would then identify and analyze the adverse or positive factors affecting the sales. If sales were down, the meeting

71

participants would attempt to troubleshoot the adverse factors, including identifying potential remedies – *e.g.*, promotions, advertisements, coupons, or other "levers" – to mitigate or offset the headwinds. According to Owen's public statements, the Company "identif[ied] and adapt[ed] and course correct[ed] around trends very, very fast."

219. Accordingly, during the Class Period, Company management, including Vasos and Owen, among others, knew about and would have been troubleshooting the same-store sales decline reported by CW 3, CW 4, and CW 5 and witnessed in several of the Company's regions beginning in April 2016 and continuing throughout May 2016, right before Vasos reassured investors that the "current" macroeconomic environment would not prevent them from achieving Dollar General's targeted same-store sales growth.

220. The Company also captured data on and analyzed its inventory "to assess the true contribution of each and every item" as part of its "categorical management" process. *See supra* ¶¶ 51-58. Through this five-step categorical management process, Company executives, including Owen, "continually monitor[ed]" Dollar General's performance. In fact, according to Vasos during an August 25, 2016 conference call with analysts, "we don't do anything without fully testing it first." As a result, the Company held senior management "accountable for each any every item's contribution" to the Company's financial results.

221. In addition, through the Company's automatic inventory replenishment system, launched in August or September 2015, the Company was able to ensure that each store had "the products that [its] customer wants when she comes in a store and has it for her at the right price." Accordingly, Defendants would have immediately seen that the Company had excess inventory on hand, as described by CW 8, due to the fact that the inventory levels had been set based on the prior year's level of purchases by SNAP participants.

222.     Similarly, the Company used data analytics, customer insights, and customer segmentation to improve demand forecasting and target promotions, and maintain a "deep and actionable understanding of [its] customers." According to the Company's former Executive Vice President and Chief Merchandising Officer, Thorpe, "We know who [our customers] are, where they shop, how they shop, what they buy, how much they spend but more importantly we know their attitudes and their behaviors. And we get this through our integrated and actionable customer segmentation process." Using customer-specific data, the Company made "merchandising and pricing decisions . . . including how [it] market[s] and brand[s] to [its] customers" and how it "operate[s]" its "stores each and every day."

223.     In fact, Company executives paid regular visits to individual stores and met with its core customers to further understand the Company's operations. According to public statements made by Vasos in August of 2016, "We spend a lot of time in the stores. I am out a couple times a month with our head merchant - our head operator and we see first hand this consumer each and every time we are out."  In December 2016, Vasos confirmed that these meetings with core customers took place at least "each and every quarter." CW 2 similarly recalled that other executives, including Vice Presidents, sporadically visited stores and gave advice on displays and stocking inventory.  Likewise, Vasos stated, during a December 2016 conference call to discuss the Company's earnings, that "we talk to our consumers each and every quarter through panel data as well as we bring them in and talk to them in general" to learn what adverse trends were affecting their spending.

224.     As part of its deep understanding its inventory systems and core customer, the Company monitored changes to SNAP, including the dates on which SNAP benefits would be reloaded.  Based on the dates of a SNAP benefit reload in a particular state, for example, the

Company would direct stores to display and keep in stock certain items that its SNAP customers frequently purchased. By catering to its SNAP customers' purchasing power and spending habits, the Company endeavored to draw more foot traffic into the stores.

225. Dollar General's data analytics were purportedly so detailed that the Company could determine the average dollar spent and the other items purchased by a customer who purchased a gallon of milk. Similarly, the Company could determine whether a customer who purchased a pack of cigarettes, also typically purchased a can of Coke. From this type of analysis, merchandising and marketing personnel would direct individual store managers on items to keep in stock in stores, as well as dictate the types of displays to be used for marketing.

226. Thus, Dollar General's data analytics would have revealed that the losses being caused by the 2016 SNAP benefits expiration were, as CW 3 reported, not just limited to SNAP-eligible products, but also included non-eligible products such as cigarettes, alcohol, gum, toys, and other add-on items. Data would have also revealed, as CW 1 confirmed, that the 2016 SNAP benefits expiration resulted in lower health and beauty sales, demonstrated by lower sales of shampoo, conditioner, and makeup after the SNAP benefits were reduced.

227. Given all of the various types of data (including detail about every transaction at every store, categorical/inventory productivity, and changes to SNAP) available to Defendants on a daily, weekly, and monthly basis that was discussed at Weekly Sales Meetings and utilized by various departments as part of Dollar General's "data driven statistical approach to operations," and the immediate impact the 2016 SNAP benefits expiration was having on the Company, Defendants knew or were reckless in not knowing that the 2016 SNAP benefits expiration was adversely impacting the Company's same-store sales. Their access to comprehensive and particularized information was remarkable.

228.     Moreover, in light of the Company's categorical, inventory, and customer segmentation processes, including the Company's ability to monitor changes in SNAP reload dates, Defendants knew or were reckless in not knowing that the loss of these customers would and did amount to not only the loss of the SNAP dollars spent by these customers, but also the non-SNAP, discretionary purchases typically made with every transaction. In addition, Defendants knew or were reckless in not knowing that the adverse impact of the 2016 SNAP benefits expiration could not be mitigated by any "merchandising initiatives" or other similar measures that required a SNAP customer to already be in the store. Likewise, Defendants knew or were reckless in not knowing that Dollar General's core customer's outlook at the end of May 2016 was not the same as it had been at the end of January 2016 before the 2016 SNAP benefits expiration had taken effect.

**B.      Defendants Knew or Were Reckless in Not Knowing that the 2016 SNAP Benefits Expiration Would Have an Adverse Impact on the Company Based on Their Experience With the 2013 SNAP Benefits Reduction**

229.     Given the Company's experience with the first round of SNAP benefits cuts in 2013, the impact of that benefits reduction (but not elimination) on its customers who participated in SNAP, and the subsequent decline of the Company's same-store sales, Defendants knew or were reckless in not knowing that the total elimination of benefits for certain ABAWDs caused by the 2016 SNAP benefits expiration would materially affect its core customers' shopping habits, including whether these customers would even shop at Dollar General, let alone utilize discretionary income to purchase non-eligible products, and its same-store sales growth.

230.     As discussed above, the 2013 SNAP benefits reduction significantly reduced what a SNAP participant could spend on SNAP items at Dollar General stores, and changed when and how often the benefits were distributed to participants. As a result of this cut, Dollar General saw

a significant effect on its core customer's spending habits – including lower sales of SNAP-eligible products, fewer non-SNAP, discretionary purchases, fewer "splurge" trips at the beginning of each month, and overall less foot traffic from SNAP participants who went to big box stores to fulfill all of their needs in one trip instead. The Company also experienced issues with its inventory system, which assumed that benefits would be reloaded at the beginning of each month, and had to readjust its inventory practices based on new reload dates.

231.   The 2013 SNAP benefits reduction had the immediate and serious effect of causing a deceleration in the Company's same-store sales. While originally downplaying the significance of SNAP on its sales, the Company later admitted that it had "underestimated the impact" of the 2013 SNAP benefits reduction. In March 2014, the Company acknowledged that the drastic decline in its same-store sales growth was due in part to "a pull back in our core customer spending" caused by, among other things, "reduced government assistance."

232.   Given the Company's direct experience with the sales decline and operational changes that were the result of the 2013 benefits reduction, Defendants knew or were reckless in not knowing that the 2016 SNAP benefits expiration would have the same, if not worse, effect on Dollar General's same-store sales growth. Defendants admitted as much, with Vasos stating, in August 25, 2016, that the 2016 SNAP benefits expiration had affected the Company in "almost exactly the same way on our comps" as the 2013 SNAP benefits reduction, which caused Dollar General's "traffic [to] slow[] tremendously" similar as it did in reaction to the 2013 SNAP benefits reduction.

233.   Moreover, given that Defendants engaged in detailed analysis of adverse factors affecting declines in store sales, they would have done extensive analysis into the cause, effects, and mitigating factors of the 2013 SNAP benefits reduction. Vasos, in fact, confirmed, in August

of 2016, that the Company had analyzed the factors accompanying the 2013 SNAP benefits reduction, stating that "by the way, we've seen [those factors] play out before." In December 2016, Vasos reiterated to investors that, while the 2016 SNAP expiration is "a little bit different time and date[, ] I can tell you that it's a lot like 2013."

234. Accordingly, Defendants knew or were reckless in not knowing that any new initiatives – for example, merchandising initiatives – would not offset the effects of the 2016 SNAP benefits expiration, including the loss of foot traffic from SNAP participants in Dollar General's stores. Indeed, the 2013 SNAP benefits reduction only affected one aspect of SNAP – the benefit amount received by participant. The 2016 SNAP benefits expiration, in contrast, led to many of Dollar General's customers losing SNAP benefits altogether – reducing not only the amount that could be spent in stores, but eliminating the foot traffic of certain customers altogether.

## C.  Defendants Knew or Were Deliberately Reckless in Disregarding Information Concerning the Company's Core Operations

235. Throughout the Class Period, Vasos was the CEO of Dollar General—the most senior position at the Company.  Vasos joined Dollar General as Chief Merchandising Officer in 2008 and was thus familiar with Dollar General's business model, including its "data driven statistical approach to operations."

236. Likewise, Owen was Dollar General's Executive Vice President of Operations. Having spent more than 20 years at the Company, Owen was familiar with the Company's "scientific way" of decision-making and execution.  In fact, it was Owen who termed the Company's operations methodology a "Moneyball" approach, and boasted to the public the Company's data analytics, including in-store heat maps and categorical and inventory management.

237. By virtue of their high-level executive positions, Vasos and Owen directly participated and were involved in both the management and day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company's core operations. Indeed, Vasos and Owen would have participated in and requested information during the Company's Weekly Sales Meetings wherein the individual stores' sales, and factors affecting sales, were analyzed and troubleshot. Moreover, Vasos spent "a lot of time in the stores" learning about store operations and the needs of the Company's core customer. Owen, similarly, was actively involved in the Company's data analytics, visited regions and met with district managers to understand "what is working and what's not working," and even attended training sessions for district managers. During one such training, in fact, Owen expressed his concern about comps in light of the 2016 SNAP benefits expiration and proposed price reductions to make up for the loss in sales associated therewith.

238. As Dollar General's most senior executives with direct control and supervision over its business, operations, and public statements, Vasos and Owen knew or were reckless in not knowing about the Company's core operations which included selling its core product (i.e., SNAP-eligible food) to its core customers, and the subsequent fallout as a result of the 2016 SNAP benefits expiration. In fact, according to Owen, Dollar General's senior management "continually monitor[ed]" and measured the Company's performance, and were "accountable for each any every item's contribution" to the Company's financial results.

239. Indeed, throughout the Class Period, SNAP was of critical importance to the Company's profitability, reputation, and continued core customer loyalty. The Company's core customer, many of whom relied on government assistance from programs like SNAP, was of the utmost importance to the Company. These customers comprised a large portion of the

Company's customer base. CW 5, for example, confirmed that for some stores located in South Carolina, SNAP participants represented 80% to 90% of the stores' customer base. Thus, as explained by Owen during the March 2016 Investor's Day Call, the Company "focus[ed] on the customer and everything that [it did] revolve[d] around her."

240. Moreover, SNAP-eligible food items comprised over 75% of the Company's sales. Both CW 2 and CW 4 confirmed that SNAP sales in stores varied based on location but could account for as much as 50% of total sales. In fact, CW 2 noted that SNAP comprised up to 90% of some stores' sales.

241. SNAP was also important to the Company because SNAP participants tended to shop frequently and spend additional, discretionary income on products that were not eligible to be purchased with SNAP benefits.

242. As indication of SNAP's importance to the Company, Dollar General, *inter alia*, required all store managers to undergo SNAP training; mandated all stores to utilize marketing signage indicating that the store accepts SNAP; focused on tracking the core customer/SNAP participants' habits and preferences; kept in stock the items frequently purchased by core customer/SNAP participants; made in-store visits and met with core customers to understand how SNAP and other macroeconomic factors were affecting their spending habits.

243. Additionally, the 2016 SNAP benefits expiration was an extremely important event for Dollar General. While the 2016 SNAP benefits expiration only affected the rules in 22 states, Dollar General had 56% of its stores located within those 22 states. Further, given that these 22 states included the largest U.S. city by population (New York City), and 18 of the top 50 U.S. cities by population, and the disproportionate reliance on SNAP by participants located in urban areas, the effect of the expiration likely would be concentrated for Dollar General and

79

Case 3:17-cv-00063   Document 46   Filed 06/26/17   Page 82 of 98 PageID #: 495

far worse than the 2013 SNAP benefit reduction, which did not strip SNAP participants of their benefits entirely.

244.    Thus, given that Vasos and Owen were two of the most senior executives of the Company with hands-on involvement with Company operations and its core customers, they knew or was reckless in not knowing that: (i) the Company's core customer group was being impacted by the 2016 SNAP expiration; (ii) the 2016 SNAP expiration was having a meaningful impact on the Company's same-store sales through lost foot traffic of its core customers and the resulting loss of both SNAP and non-SNAP purchases; and (iii) the impact of the 2016 SNAP expiration was hitting the hardest in regions where Dollar General had its most concentrated amount of locations, which would have a detrimental effect on 56% of the Company's stores.

### D.    The Company's Bonus Structure Supports a Strong Inference of Scienter

245.    During the Class Period, Dollar General, its investors, and market analysts were highly focused on the same-store sales metric as the way to quantify the relative success of the Company's business model and merchandising initiatives, among other things. In fact, at the start of the Class Period, Dollar General had consistently met or outperformed both internal and external expectations and had reported *26 consecutive years of positive same-store sales growth and 32 consecutive quarters of positive growth*.

246.    Relatedly, as reported in the Company's 2016 Form DEF14A, the compensation of Company executives, including Vasos, was "linked to the financial performance of key metrics." Bonus and equity incentive compensation for these executives, similarly, was "performance based and exposed to fluctuations in our stock price."

247.    Accordingly, Dollar General incentivized district managers to increase same-store sales by offering bonus opportunities. The sales targets were set by the Finance Department at Dollar General's headquarters and were based on prior year sales with a sales growth percentage

built in.  CW 4, for example, received a quarterly bonus based on the percentage of targeted sales CW 4's stores achieved.  CW 2 also confirmed that store managers received bonuses based on their stores' sales results.

248.    As a result of this compensation and bonus structure, district managers and Company executives alike were keenly aware of the top areas of improvement for each store, "key metrics," and store performance, which would necessarily include: (i) the increase or decrease in same-store sales (*e.g.*, the metrics underlying the increase or decrease in a district manager's bonus); (ii) key areas of improvement for the same-store sales; and (iii) the cause and effect of factors adversely affecting the same-store sales metric.  Indeed, Owen boasted, during the March 24, 2016 call with investors that he had "visited over 35 regions since I've been back. I meet with district managers in the surrounding districts, every single time I'm out there.  We call it our power hour, and this is where we find out tell me what is working and what's not working."

249.    Company management knew about this information as a result of both evaluating and distributing appropriate bonuses to district managers as well as in furtherance of their own bonuses with corresponding performance goals and incentives to maintain the Company's stock price.

250.    Thus, Defendants knew or were reckless in not knowing that: (i) same-store sales were significantly declining during the Class Period; (ii) the 2016 SNAP benefits expiration was a key cause (or source of improvement) for the sales decline; and (iii) the 2016 SNAP benefits expiration had the butterfly effect of causing a sharp decline in non-SNAP discretionary purchases as a result of lower SNAP foot traffic.

## IX. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

251.    The statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under the Private Securities Litigation Reform Act of 1995 do not apply to the misrepresentations and omissions alleged in this Complaint.

252.    None of Defendants' historic or present-tense statements alleged herein was a forward-looking statement because none was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present-tense statements when made.

253.    To the extent that any of the materially false or misleading statements alleged herein, or any portions thereof, can be construed as forward-looking, these statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

254.    Defendants are also liable for any false or misleading forward-looking statement alleged herein, or portion thereof, because at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading, or the forward-looking statement was authorized and approved by an executive officer of Dollar General who knew that the forward-looking statement was false or misleading.

# X. CONTROLLING PERSON ALLEGATIONS

255. By virtue of Defendants Vasos' and Owen's positions of management and control within the Company, they had access to undisclosed adverse information about Dollar General's operations and performance, including information regarding the impact and severity of SNAP reductions on the Company's financial results, as particularized herein. Defendants Vasos and Owen ascertained such information through Dollar General's internal corporate documents, conversations, and connections with corporate officers and employees, attendance at Board of Directors meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Dollar General officers, directors, and managers.

256. Defendants Vasos and Owen participated in the drafting, preparation and/or approval of the various public, shareholder and investor reports and other communications complained of herein, and knew or recklessly disregarded that there were material misstatements and omissions contained therein. Because of their Board. executive, or managerial positions with Dollar General, Defendants Vasos and Owen had access to the adverse undisclosed information about Dollar General's operations and performance, including information regarding the impact and severity of SNAP reductions on the Company's financial results, as particularized herein, and knew (or were deliberately reckless in not knowing) that these adverse events rendered the positive representations made by or about Dollar General and its business, or adopted by the Company, materially false and misleading.

257. Defendants Vasos and Owen, because of their positions of control and authority as officers or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Defendants Vasos and Owen were provided with copies of the documents alleged

herein to be misleading before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, Defendants Vasos and Owen are responsible for the accuracy of the public reports and releases detailed herein, and are therefore primarily liable for the representations therein.

258. As officers, directors, and controlling persons of a publicly held company whose common stock is registered with the SEC pursuant to the Exchange Act, was traded on the NYSE, and governed by the provisions of the federal securities laws, Defendants Vasos and Owen had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and performance, including information regarding the impact and severity of SNAP reductions on the Company's financial results, as particularized herein, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based on truthful and accurate information. Dollar General's material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## XI. CLASS ACTION ALLEGATIONS

259. Lead Plaintiff brings this action on behalf of itself and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities that, during the Class Period, purchased or otherwise acquired the publicly traded common stock of Dollar General and were damaged thereby. Excluded from the Class are Defendants, members of Defendants' immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)), any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

260. The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the proposed Class. At the end of the Class Period, Dollar General had more than 276 million shares of common stock issued and outstanding, owned by thousands of persons, and actively traded on the NYSE. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Record owners and other members of the Class may be identified from records maintained by Dollar General or its transfer agent, and may be notified of the pendency of this action by a combination of published notice and first-class mail, using the techniques and form of notice similar to that customarily used in class actions arising under the federal securities laws.

261. There is a well-defined commonality of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)    whether Defendants' actions as alleged herein violated the federal securities laws;

(b)    whether Defendants' statements and/or omissions issued during the Class Period were materially false and misleading;

(c)    whether Defendants knew or were deliberately reckless in not knowing that their statements were false and misleading;

(d)    whether and to what extent the market prices of Dollar General publicly traded common stock were artificially inflated and/or distorted before and/or during the

85

Class Period due to the misrepresentations and/or omissions of material fact alleged herein; and

(e) whether and to what extent Class members sustained damages as a result of the conduct alleged herein, and the appropriate measure of damages.

262. Lead Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class purchased or otherwise acquired Dollar General publicly traded securities during the Class Period and similarly sustained damages as a result of Defendants' wrongful conduct as alleged herein.

263. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class action securities litigation to further ensure such protection, and intends to prosecute this action vigorously. Lead Plaintiff has no interests that are adverse or antagonistic to those of the Class.

264. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to seek redress for the wrongful conduct alleged herein. Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## XII. LEAD PLAINTIFF AND CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

265. Lead Plaintiff and members of the Class are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     Dollar General common stock traded in efficient markets;

(d)     the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Dollar General common stock; and

(e)     Without knowledge of the misrepresented or omitted facts, Lead Plaintiff and other members of the Class purchased or otherwise acquired Dollar General common stock between the time that Defendants made material misrepresentation and omissions and the time the concealed risks materialized or the true facts were disclosed.

266.     At all relevant times, the market for Dollar General common stock was open and efficient for the following reasons, among others:

(a)     as a registered and regulated issuer of securities, Dollar General filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

(b)     Dollar General regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Dollar General was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

(d)     Dollar General common stock met the requirements for listing, and was listed and actively traded on highly efficient markets, including NYSE, where the Company's common stock trades under the ticker symbol "DG."

267.    As a result of the foregoing, the markets for Dollar General common stock promptly digested current information regarding Dollar General from all publicly available sources, and the prices of Dollar General's stock reflected such information.

268.    Based upon the materially false and misleading statements and omissions of material fact alleged herein, Dollar General common stock traded at artificially inflated prices during the Class Period.  Lead Plaintiff and the other members of the Class purchased Dollar General common stock relying upon the integrity of the market price of Dollar General common stock and other market information relating to Dollar General.

269.    Under these circumstances, all purchasers of Dollar General common stock during the Class Period suffered similar injuries through their purchases at artificially inflated prices, and a presumption of reliance applies.

270.    Further, at all relevant times, Lead Plaintiff and other members of the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings.  Lead Plaintiff and the other members of the Class would not have purchased or otherwise acquired Dollar General common stock at artificially inflated prices if Defendants had disclosed all material information as required.  Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## COUNT I

### Asserted Against Dollar General and Vasos for
### Violations of Section 10(b) of the Securities Exchange
### Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder

271.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all other members of the Class against Dollar General,  Vasos and Owen.

272.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, regarding the intrinsic value of Dollar General common stock, as alleged herein; (ii) artificially inflate the price of Dollar General common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Dollar General common stock at artificially inflated prices that did not reflect their true value.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

273.    Defendants directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain the artificially inflated price of Dollar General common stock in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

274.     Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Dollar General's value and performance, which included the making of untrue statements of material facts and omitting material facts necessary in order to make their statements, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein.  Defendants did not have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Dollar General common stock during the Class Period.

275.     Defendants are liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements and omissions included in press releases, conference calls, SEC filings, news media, blogs, and Dollar General's website.

276.     Defendants are further liable for the false and misleading statements made by Dollar General's officers, management, and agents in press releases, conference calls, conferences with investors and analysts, news media, blog reports, and Dollar General's website, as alleged above, as they either made or controlled such statements and had ultimate authority and responsibility for the contents thereof.

277.     Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing from the investing public the relevant truth, and misstating the intrinsic value of Dollar General common stock.   By concealing material facts from investors, Defendants maintained the Company's artificially inflated common stock prices throughout the Class Period.

278.     Without knowledge of the fact that the price of Dollar General common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements and omissions made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Dollar General but not disclosed in public statements by Dollar General during the Class Period, Lead Plaintiff and the other members of the Class purchased or acquired Dollar General common stock during the Class Period at artificially high prices and were damaged when that artificial inflation was removed from the price of Dollar General common stock.

279.     At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff, the other members of the Class, and the marketplace known of the truth concerning the Company's conduct and the intrinsic value of Dollar General's common stock, Lead Plaintiff and other members of the Class would not have purchased or acquired their Dollar General common stock, or, if they had purchased or acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices they paid.

280.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

281.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of Dollar General common stock during the Class Period.

## COUNT II

### Asserted Against Defendants Vasos and Owen for Violations
### of Section 20(a) of the Securities Exchange Act of 1934

282.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiff and all other members of the Class against the Defendants Vasos and Owen.

283.    At all relevant times during the Class Period, as set forth in ¶¶ 27-28, *supra*, Vasos was the Company's CEO and a member of the Company's Board of Directors, and Owen was the Company's Executive Vice President of Store Operations.  As such, both Vasos and Owen had regular access to non-public information about Dollar General's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

284.    Defendants Vasos and Owen acted as a controlling persons of Dollar General within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of Dollar General's day-to-day operations, and/or knowledge of statements filed by the Company with the SEC and/or disseminated to the investing public, Defendants Vasos and Owen had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company and its executives, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading.

92

285. Defendants Vasos and Owen were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

286. In particular, Defendants Vasos and Owen had direct and supervisory involvement in and control of the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular conduct and transactions giving rise to the securities violations as alleged herein, and exercised the same.

287. As set forth above, Dollar General and Defendants Vasos and Owen each violated Section 10(b) and Rule 10b-5 by their acts, statements and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Defendants Vasos and Owen are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of Dollar General common stock during the Class Period.

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding damages and equitable relief in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

93

## XIII. JURY TRIAL DEMANDED

288.    Plaintiff hereby demands a trial by jury.


Dated: June 26, 2017                          Respectfully submitted,

                                              **KESSLER TOPAZ MELTZER**
                                              **    & CHECK, LLP**

                                              */s/  Jennifer L. Joost*
                                              Jennifer L. Joost (admitted *Pro Hac Vice*)
                                              Rupa Nath Cook (*Pro Hac Vice* pending)
                                              One Sansome Street, Suite 1850
                                              San Francisco, CA 94104
                                              Telephone: (415) 400-3000
                                              Facsimile: (415) 400-3001
                                              jjoost@ktmc.com
                                              rcook@ktmc.com

                                              -and-

                                              Andrew L. Zivitz (admitted *Pro Hac Vice*)
                                              Jonathan F. Neumann (*Pro Hac Vice* pending)
                                              280 King of Prussia Road
                                              Radnor, PA  19087
                                              Telephone: (610) 667-7706
                                              Facsimile:  (610) 667-7056
                                              azivitz@ktmc.com
                                              jneumann@ktmc.com

                                              *Attorneys for Lead Plaintiff and the Class*

                                              **BERKE, BERKE & BERKE**
                                              Charles A. Flynn (BPR # 30878)
                                              Ronald J. Berke (BPR #1741)
                                              420 Frazier Avenue
                                              Chattanooga, TN  37405
                                              Telephone:  (423) 266-5171
                                              Facsimile:   (423) 265-5307
                                              chuck@berkeattys.com
                                              ronnie@berkeattys.com

                                              *Liaison Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

/s/  Jennifer L. Joost
Jennifer L. Joost